**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case Action No. 3:24-cv-00783-FDW-DCK**

Jameson[1] C., minor, by next friend STEVEN BOLCH; Sara M., Leah M., Harry M., minors, by next friend KARI DANFORTH; Megan S. and Chloe S., minors, by next friend DARIA BARAZANDEH; Annie W., Justin B., Morgan G., minors, by next friend, VERONIKA MONTELEONE; Sylvia T., minor, by next friend ANNE RICHEY; Ava J., minor by next friend KAYLA DEWALD; Alice B., minor by next friend KIMBERLY CROTHERS; Rene S., minor by next friend JACKSON ALBERT, and all others similarly situated,

          Plaintiffs,

  v.

ROY COOPER in his official capacity as the Governor of North Carolina, NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES, KODY KINSLEY in his official capacity as Director of the North Carolina Department of Health and Human Services, SUSAN OSBORN in her official capacity as Assistant Secretary for County Operations of the Division of Social Services, MARK PAYNE is the Director of the Division of Health Service Regulation, MECKLENBURG COUNTY, MECKLENBURG DEPARTMENT OF SOCIAL SERVICES-YOUTH AND FAMILY SERVICES, GASTON COUNTY, GASTON DEPARTMENT OF SOCIAL SERVICES, DAVIDSON COUNTY, DAVIDSON COUNTY DEPARTMENT OF SOCIAL SERVICES, HARNETT COUNTY, HARNETT COUNTY DEPARTMENT OF SOCIAL SERVICES, RANDOLPH COUNTY, RANDOLPH COUNTY DEPARTMENT OF SOCIAL SERVICES, ROCKINGHAM COUNTY, ROCKINGHAM COUNTY DEPARTMENT OF SOCIAL SERVICES, JOHNSTON COUNTY, and JOHNSTON COUNTY DEPARTMENT OF SOCIAL SERVICES.

          Defendants.

**AMENDED CLASS ACTION COMPLAINT**

---

[1] In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure, the first names of the Plaintiff children and any other minors mentioned by name in this Complaint are pseudonyms. The first letters of the pseudonyms and the last name initials are the same as their real names.

## PRELIMINARY STATEMENT

1.      North Carolina's foster care system has been operating in a state of crisis for years. The foster care population is increasing while foster home capacity decreases. Children are placed into institutions at twice the national average, are shuttled between placements with disturbing frequency, and do not receive adequate services or necessary medical treatment or education. Caseworkers are not receiving adequate training or support, they cannot manage the crushing caseloads, morale is low, and turnover is outpacing recruitment. State leadership predicted, correctly, that this crisis would invite "a massive class action lawsuit."

2.      When the State takes a child into custody, it becomes responsible for the child's safety and wellbeing. The North Carolina Department of Health and Human Services ("DHHS") and the 100 county departments of social services ("County DSS") share responsibility for North Carolina's foster children, and they share responsibility for the State's continuous and systematic failure to protect and provide for North Carolina's foster children. For over a decade, DHHS has ignored numerous warnings that its failure to lead and supervise county departments of social services ("county DSS" or "DSS") threatens the safety and wellbeing of foster children, and its ongoing failure to supervise and support county DSS places foster children across the state at substantial risk of harm. And County Defendants—Mecklenburg County, Mecklenburg Department of Social Services-Youth and Family Services (Mecklenburg DSS-YFS), Gaston County, Gaston Department of Social Services (Gaston DSS), Davidson County, Davidson County Department of Social Services (Davidson DSS), Harnett County, Harnett County Department of Social Services (Harnett DSS), Randolph County, Randolph County Department of Social Services (Randolph DSS), Rockingham County, Rockingham County Department of Social Services (Rockingham DSS), Johnston County, Johnston County Department of Social Services

(Johnston DSS)—have failed to provide timely and appropriate treatment, to place children in safe and appropriate foster homes, to thoroughly investigate allegations of maltreatment in care, and to recruit necessary and appropriate foster homes.

3. The Defendants' ongoing failures place foster children at significant risk of serious harm in violation of their rights under federal law and the U.S. Constitution.

4. According to Kody Kinsley, the Secretary of DHHS, "[i]n any given week, dozens of children in foster care are living in emergency departments and child welfare offices. And among the children who struggle to find an appropriate placement that have been referred to the department for additional help and coordination, a quarter of these children have been moved *fifty times or more*." DHHS's placement deficit is compounded by its services deficit. More than 60% of counties "have zero children or adolescent psychiatrist[s]."

5. DHHS has confirmed these observations: "[e]ach week, dozens of children with complex behavioral health needs require immediate protection in a safe and supportive environment that can meet their physical and mental health care needs. The number of children with these needs far exceeds the spaces and services available to keep them safe, help them overcome crisis and reunite them with family and community. As a result, they can be found sleeping in hospital emergency rooms, in county departments of social services offices or local hotel rooms. 'Living' in these inappropriate settings compounds the trauma that children experience during separation from their families and natural support systems. The longer children are separated from their families, the less likely they are to be reunified with them, and they run a higher risk of experiencing poor health and social outcomes, including homelessness and involvement with the justice system."

6.     Secretary Kinsley has also highlighted North Carolina's crisis-level staffing problems. DHHS's 28% vacancy rate "has doubled since COVID," 25% of counties have turnover rates exceeding 40%, "and high turnover is linked to longer stays in foster care." The 2020-2024 Child and Family Services Plan noted that "Child welfare staff feel overwhelmed, unable to complete the work they are assigned, and struggling to manage a work-life balance."

7.     The named plaintiffs—Jameson C. (Gaston County); Megan S. and Chloe S. (Johnston County); Annie W. (Mecklenburg County); Justin B. (Mecklenburg County); Morgan G. (Mecklenburg County); Sara M., Leah M., and Harry M. (Alleghany County); Sylvia T. (Randolph County); Alice B. (Harnett County); Ava J. (Davidson County); Rene S. (Rockingham County)—are children in foster care in North Carolina. They bring this lawsuit as a civil rights action on behalf of all children who are now, or will be, in the custody of county departments of social services "under the supervision of the Department of Health and Human Services." G.S. § 108A-1. They seek both declaratory and injunctive relief against the state agency, state officials, and named counties responsible for violating their rights under the United States Constitution and federal law, which promise vulnerable children in state custody the right to be free from physical and psychological harm, and impose an affirmative obligation on the state to protect foster children against such harm.

8.     Additionally, plaintiffs seek both declaratory and injunctive relief against County Defendants for maintaining policies, practices, and customs that violate plaintiffs' rights under both federal and state law.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a), and 42 U.S.C. § 12133 and 29 U.S.C. § 794a(a)(2). This Court has jurisdiction to issue declaratory and

injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure. In addition, the court may exercise supplemental jurisdiction over the claim based on North Carolina law pursuant to 28 U.S.C 1367(a).

10.     Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this District, and Defendants maintain offices and conduct business in this District.

**PARTIES**

**I.      Named Plaintiffs**

**Jameson C.**

11.     Jameson C. is an 8-year-old boy from Gaston County. He has been in foster care for half his life. Jameson appears in this action through his next friend, Steven Bolch. Steven Bolch is employed as a pharmacy technician and previously worked at a clinic for behavioral health services. Steven fostered Jameson for 18 months. Steven has acquainted himself with the allegations in the Complaint regarding Jameson's experience in foster care and is dedicated to his best interests.

12.     In May 2019, shortly after his 4th birthday, DSS removed Jameson from his home and placed him into foster care because his parents sexually, physically, and emotionally abused him.

13.     In the two years following his removal, from May 2019 to June 2021, DSS placed Jameson in five different foster homes all over the state. He lived in Cherokee County, Lincoln County, Mecklenburg County, and Gaston County, and moved between several different catchment areas including Vayo, Partners, and Cardinal.

14.     After DSS removed Jameson from his family's home, Jameson was diagnosed with PTSD due to severe sexual, physical, and emotional abuse, as well as ODD, and ADHD. In the

two years following his removal, Jameson never received mental health treatment or specialized therapy. Indeed, consistent treatment was impossible given the frequency and distance of his placement changes. Instead, Jameson was placed on a medication regime that included at least eight different medications, including psychotropic medications.

15.     In June 2021, Jameson arrived at his 5th placement. The foster parent, a pharmacy technician and behavioral health specialist, immediately began the process of reducing polypharmacy and securing specialized mental health treatment. The foster parent petitioned DSS to reduce the medication regimen and successfully discontinued the use of psychotropic drugs. To address the untreated PTSD, the foster parent secured mental health therapy services for Jameson. And to address the untreated sexual trauma, the foster parent entered Jameson into a specialized sexually problematic behavioral therapy program through Duke University. DSS did not assist in obtaining any of these services.

16.     Jameson's medical treatment was inconsistent because his parents refused to provide consent for treatment or could not be reached to obtain consent, and DSS did not make reasonable efforts to obtain consent or otherwise ensure that Jameson received necessary medical treatment. When COVID vaccines were approved for children, the parents refused to consent to vaccination. When DSS was unable to contact the parents to obtain consent to administer a different brand of ADHD medication, Jameson went without his medication.

17.     During his first six months in this placement, Jameson was required to visit his parents, alternating between weekly, bi-weekly, and monthly visits. After each visit, Jameson engaged in problematic sexualized behaviors. The foster parent tracked these behaviors and shared the information with Jameson's caseworker, but the visitations continued.

18.     During a hearing in December 2021, Jameson's parents requested that monthly visits be changed to weekly visits. DSS knew that Jameson's sexually problematic behaviors were triggered when he visited his parents, his sexual abusers, but despite this knowledge, DSS recommended bi-weekly visitation.

19.     After nearly 32 months in foster care, long past the federal requirement, DSS still had not filed to terminate Jameson's parents' parental rights. The foster parents expressed an interest in adopting Jameson, but DSS said that it had no plans to file for a termination of parental rights. DSS explained that it would not file TPR for Jameson because DSS policy prohibited TPR for only one sibling, and Jameson's older brother was not in an adoptive placement and did not at that time have any prospects of an adoptive placement.  DSS, however, did not point to any specific policy that prevented a younger sibling from being adopted where their older sibling was not in an adoptive home.

20.     In the months following the hearing, Jameson had bi-weekly visits with his parents, and Jameson's sexual behaviors worsened. He perpetrated sexual acts on children at daycare and at school, on the foster parents' young nephews, and against animals.

21.     Jameson's case was not well managed as Jameson's caseworker was managing approximately 20 cases and even more individual children, and was attempting to manage these cases without a reliable case management system. Coming from South Carolina child welfare services, where she utilized an electronic case management system, the caseworker relayed that she was surprised and distressed that DSS was operating under a paper-based system. Case files were stashed in cabinet drawers: with files for 18 children stuffed into one drawer; Jameson's case, lengthier and more complicated, occupied another drawer. The caseworker was unable to keep up with all the paperwork and documentation in DSS's archaic system.

22.     The foster parents had learned to manage Jameson's behaviors and implement safety plans to prevent problematic sexual behaviors. But the specialized treatment behavior management was only so effective after the two years of untreated trauma. Around June 2022, Jameson's sexualized behavior was directed to the foster parents, and they felt that it was no longer in Jameson's best interests to remain in their home.

23.     The foster parents requested that DSS remove Jameson and provided 30 days notice. DSS couldn't find a placement for Jameson, so the foster parents agreed to extend the placement. It took approximately 120 days for DSS to find a new placement for Jameson.

24.     Around October 2022, DSS placed Jameson with an experienced foster parent in Charlotte, NC. The new foster parent called the former foster parents multiple times per week seeking advice on how to manage Jameson's worsening behaviors. Jameson's caseworker often called the former foster parents seeking information about Jameson's medication regimen. Unable to control his behaviors, Jameson was again placed on psychotropic drugs, including Risperidone. Jameson was 7 years old.

25.     As a result of Jameson's new placement, Jameson lost his relationship with his therapist with whom he had finally developed a trusting relationship. The loss of this important relationship further contributed to Jameson's instability.

26.     Jameson has changed placements several times since then and is now in his eighth placement. After four years in state custody, DSS still has not filed to terminate parental rights and Jameson's permanency plan continues to remain uncertain.

27.     As a direct result of Defendants' actions and inactions, Jameson has suffered and continues to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable

case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Jameson's case, and not acted with deliberate indifference to his legal rights, Defendants may have prevented Jameson's condition from deteriorating while in state custody. Without relief, Jameson's condition will continue to suffer from placement instability, lack of appropriate services, and delayed permanency.

### Megan S. and Chloe S.

28. Megan, seven years old, and her sister Chloe, five years old, are from Johnston County. Megan and Chloe appear in this action through their next friend, Daria Barazandeh. Daria Barazandeh began fostering children in North Carolina in 2012. Having spent over a decade as a foster parent, adoptive parent, and foster parent advocate, Daria is familiar with North Carolina's foster care system. Daria has acquainted herself with the allegations in the Complaint regarding Megan and Chloe's experience in foster care and is dedicated to their best interests.

29. Megan and Chloe were taken into custody on or about September 2019 based on allegations of physical abuse, sexual abuse, and neglect. Megan was three and Chloe was less than a year old.

30. Megan has been diagnosed with various disabilities, including ADHD, autism, reactive attachment disorder, and oppositional defiant disorder. She has been on several prescription medications, including Zoloft, Prozac, Adderall, Abilify, Focalin, and Catapres. Both children show signs of Fetal Alcohol Syndrome and/or Neonatal Abstinence Syndrome, including sensory sensitivities, but DSS has not yet had them diagnosed. Additionally, the girls suffer from other physical conditions attributable to prenatal exposure to toxins.

31. DSS first placed the children with a family friend. But because DSS did not provide the appropriate supports, the placement disrupted after one month.

32.     DSS then placed the children with Ms. O., a foster parent. During this time, DSS failed to secure therapy for the children. Ms. O had to secure services on her own.

33.     Ms. O was willing to be a guardian for Megan and Chloe, and the girls' parents agreed to this. DSS had been working on a plan to terminate the parental rights of Megan and Chloe's parents so that Ms. O. could adopt them. But suddenly, after two years in the home of Ms. O, DSS removed the children without explanation, and without another adoptive home. DSS threatened to deny Ms. O and the children an opportunity to say goodbye if Ms. O objected to the removal. DSS gave the girls a few minutes to pack and say goodbye.

34.     After DSS removed Megan and Chloe from Ms. O's home, DSS cycled the girls between seven different foster homes. Due to the untreated trauma and high frequency placements, Megan's mental health deteriorated and her behavioral issues worsened, often manifesting in angry outbursts. Without adequate support from DSS, the placements disrupted. Megan struggled to bond with the various foster parents.

35.     Finally, a foster parent asked DSS to remove Megan and leave Chloe. DSS agreed to separate the girls. Megan's behavior worsened when she heard the news. DSS placed Megan in a residential treatment facility in and around August 2023. DSS did not tell Megan's parents where she was placed even though the case plan goal is still reunification and DSS has not moved to terminate parental rights.

36.     Although Megan was required under North Carolina law to be enrolled in school, DSS had not done so. Because the residential treatment facility in which she was placed did not have educational programing, Megan was sent to the Johnston DSS office during the day.

37.     On or about October 4, 2023, Johnston DSS, struggling with staffing vacancies, left Megan unsupervised in a DSS office in the same room with a 17-year-old boy, and the boy sexually

assaulted Megan. DSS sent Megan to the emergency room for evaluation and immediately placed her back in the residential treatment facility. The perpetrator has since been charged with first degree statutory assault. Upon information and belief, Megan has not received any specialized treatment or therapeutic support to cope with the assault.

38.     Megan has since been removed from residential treatment and placed in a foster home. She remains separated from her sister, Chloe.

39.     Although the girls have been in custody for over two years, DSS still has not filed a petition to terminate parental rights. Because DSS has not made any significant steps towards either reunification or adoption for the children, the girls are unlikely to reunite or obtain permanency in the near future.

40.     The court ordered monthly visitations with the parents, but the girls' caseworker has denied the parents visitation since at least October 2023. Upon information and belief, DSS has not moved to modify the court order; the caseworker has simply refused to comply with it.

41.     As a direct result of Defendants' actions and inactions, Megan and Chloe have suffered and continue to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Megan and Chloe's case, and not acted with deliberate indifference to their legal rights, Defendants may have prevented Megan and Chloe's condition from deteriorating while in state custody. Without relief, Megan and Chloe will continue to suffer from placement instability, lack of appropriate services, and delayed permanency.

**Annie W.**

42.     Annie is a thirteen-year-old girl from Mecklenburg County. She has been in foster care since she was five years old. Annie appears in this action through her next friend, Veronika S. Monteleone. Veronika Monteleone is a public defender based in Charlotte, NC. Having spent nearly a decade representing children in court, Veronika is familiar with North Carolina's foster care system. Veronika has acquainted herself with the allegations in the Complaint regarding Annie's experience in foster care and is dedicated to her best interests.

43.     Mecklenburg DSS took Annie into custody in 2015 based on a finding of neglect. Although her parents' parental rights were terminated in 2018, DSS has not placed her in an adoptive home before or since that time.

44.     Annie has severe developmental delays and acute mental health issues. She has an extensive history of mental health treatment and has been hospitalized numerous times since she was taken into DSS custody. She has also been diagnosed with fetal alcohol syndrome. She is on three different psychotropic medications, including one to treat her ADHD and two mood stabilizers.

45.     Despite her developmental delays, Annie was not evaluated and did not receive early intervention services. She has been enrolled in special education programs since 2017.

46.     Since DSS took Annie into custody, DSS has placed her in at least 22 foster placements, including three different PRTFs. Because these placements were ill-prepared to support Annie's mental health needs, the placements quickly disrupted, and Annie's condition rapidly deteriorated. Annie cycled in and out of hospitals, where she stayed for months at a time because DSS could find no other placement. In July 2019, DSS removed Annie from a hospital setting and placed her in an emergency placement with a new family. Annie went back to the

hospital after only one day in her new placement. In September 2020, after yet another placement disrupted, Annie was again admitted to a hospital where she remained for five months.

47.     DSS placed Annie in Levine Children's Hospital in October 2023. Annie remained there for six months. Because Levine Children's Hospital is not a mental health treatment facility, Annie did not receive the mental health treatment necessary to ameliorate her risk of further deterioration and instituionalization. Nor did Annie receive appropriate eduational services while placed in Levine Children's Hospital, including including special education programs needed to address Annie's severe developmental delays.

48.     Following her extended stay at Levine Children's Hospital, Annie was transferred to a non-institutional placement and enrolled in school.

49.     As a direct result of Defendants' actions and inactions, Annie has suffered and continues to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Annie's case, and not acted with deliberate indifference to her legal rights, Defendants may have prevented Annie's condition from deteriorating while in state custody. Annie remains at risk of deterioration due to placement instability, lack of appropriate services, and delayed permanency.

**Justin B.**

50.     Justin is a 16-year-old boy from Mecklenburg County. Justin appears in this action through his next friend, Veronika S. Monteleone. Veronika Monteleone is a public defender based in Charlotte, NC. Having spent nearly a decade representing children in court, Veronika is familiar

with North Carolina's foster care system. Veronika has acquainted herself with the allegations in the Complaint regarding Justin's experience in foster care and is dedicated to his best interests.

51.     Mecklenburg DSS took Justin into custody in 2011 due to domestic abuse.

52.     DSS initially placed Justin with his maternal grandmother. DSS knew that Justin's mother had been removed from Justin's grandmother based on allegations of abuse. Justin remained in his grandmother's home from 2011 to 2016. During that time, Justin was sexually abused.

53.     In 2016, DSS removed Justin and his siblings from his grandmother.

54.     Justin suffers from PTSD as a result of the sexual abuse. And his condition worsened because his did not receive timely and appropriate treatment for his trauma.

55.     Since 2016, DSS has placed Justin in over 18 placements, including a psychiatric residential treatment facility (Alexander Youth Network, Greensboro) and a group home (Miracle Houses) where Justin (then 13 years old) resided with older youth. DSS also placed Justin in a series of emergency placements, emergency therapeutic-like placements, and therapeutic foster homes. Justin lived with a sibling in only one of these placements.

56.     DSS also placed Justin in many rapid response homes, including homes operated by Unique Caring Foundation ("UCF"). Mecklenburg DSS contracts with UCF to provide short-term (30 day) foster home placements. These placements are considered equivalent to therapeutic foster homes, but, unlike therapeutic foster homes, UCF is paid by DSS under contract rather than through Medicaid. Justin was placed in a rapid response home for more than a year. He did not receive therapeutic services or education services. During this time, his mental and emotional health deteriorated, and his educational growth was stunted.

57. Because of the high frequency of placement changes, Justin was transferred to over 10 different schools.

58. At least 5 different case workers have been assigned to Justin's case. Caseworker turnover caused poor communication and case planning on Justin's case.

59. In 2023, DSS found an adoptive home for Justin. Initially, the prospective adoptive parents felt prepared to adopt Justin based on the information that DSS provided to them. But after learning about Justin's full history, the adoptive parents believed that they could not adequately care for Justin and ended the adoption process. Justin was aware that the adoptive parents had rejected him. This caused even more trauma.

60. Upon information and belief, Mecklenburg DSS routinely withholds information about children from adoptive parents to persuade those parents to adopt foster children. But when those parents learn about the child's extensive needs (either before or after adoption), the adoption disrupts. Mecklenburg DSS's practice of withholding information from adoptive parents results in disruptions that compound the child's trauma and reduce the likelihood of future adoptions and placements.

61. After the adoption process disrupted, DSS suddenly terminated Justin's long-time therapist, who specialized in trauma and sexual abuse, and with whom Justin had developed a trusting relationship.

62. After his mental health treatment was disrupted, Justin struggled in an emergency placement. At one point, staff at the provider day program called police and a mobile crisis unit. Justin was calm by the time they arrived, but he was transported to a hospital emergency room.

63. Justin spent Christmas in the hospital because DSS was unable to locate a placement for Justin. Justin's hospitalization was not medically necessary. While hospitalized,

Justin was not receiving treatment for his mental health, was not attending school, and was not moving towards permanency.

64.     DSS failed to monitor Justin while he was in the hospital. At one point, DSS did not know what hospital Justin was in.

65.     Mecklenburg DSS routinely transports foster children to local hospitals with the expectation that those children will remain at the hospital on a "social hold" until an appropriate placement can be found. While in the hospital, these children do not receive their regular treatments and do not receive educational services.

66.     Justin was discharged from the hospital on January 18, 2024 and placed in an emergency residential treatment program. Upon information and belief, there was no clinical recommendation or certificate of need for Justin's placement at a residential treatment facility. Although placement in these emergency residential treatment programs are not intended to exceed 120 days, Justin has been there for seven months. He is still there.

67.     Justin's mother faces mental health challenges, but DSS failed to secure appropriate services for Justin's mother. Because DSS did not attempt efforts at reunification, Justin's parents' parental rights were terminated. Although Justin has a permanency plan of adoption, DSS has not placed him in an adoptive home and is not actively seeking an adoptive home.

68.     After nearly a decade in custody with no prospect of permanency, Justin's mother has expressed a renewed interest in the case, and the judge has reconsidered the possibility of reunification.

69.     As a direct result of Defendants' actions and inactions, Justin has suffered and continues to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable

case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Justin's case, and not acted with deliberate indifference to his legal rights, Defendants may have prevented Justin's condition from deteriorating while in state custody. Justin remains at risk of deterioration due to placement instability, lack of appropriate services, and delayed permanency.

### Morgan G.

70.     Morgan is a 15-year-old boy from Mecklenburg County. Morgan appears in this action through his next friend, Veronika S. Monteleone. Veronika Monteleone is a public defender based in Charlotte, NC. Having spent nearly a decade representing children in court, Veronika is familiar with North Carolina's foster care system. Veronika has acquainted herself with the allegations in the Complaint regarding Morgan's experience in foster care and is dedicated to his best interests.

71.     Mecklenburg DSS removed Morgan and his siblings from their biological parents in 2014 due to repeated physical abuse and domestic violence. Morgan also exhibits signs of a history of sexual abuse.

72.     Morgan has been diagnosed with intellectual disability, attention deficit/hyperactivity disorder, combined presentation, disruptive mood dysregulation disorder, oppositional defiant disorder, and other unspecified trauma and stressor-related disorders. Although his care coordinators have suspected that he is on the autism spectrum, Morgan has never been tested for autism.

73.     Morgan's experience in DSS custody has been marked by extreme instability. DSS has changed his placement at least 30 times. These repeated placement changes have caused significant disruption to his education and social services. The placement changes have also led to

a severe deterioration in his mental and emotional state, exacerbating underlying emotional and behavioral issues, and creating a vicious cycle of crisis, disruption, and further instability.

74.     Within his first year in DSS custody, from April 2014 to May 2015, Morgan experienced 11 placement changes alone.

75.     DSS placed Morgan in a therapeutic foster home in May 2015 and he remained there until March 2019. The placement disrupted due to Morgan's behavioral issues and DSS's failure to provide sufficient services to Morgan or support to his foster parents. DSS failed to make reasonable attempts to place Morgan in a home where he could live for substantial period of time.

76.     DSS placed Morgan in 18 placement changes between March 2019 and February 2020, with many placements lasting no more than a few days.

77.     These constant placement changes caused Morgan to change elementary schools approximately six different times. Given his significant intellectual disability and other mental and emotional deficits, the lack of consistency in his education has further destabilized Morgan. Even worse, Morgan has gone years without any educational instruction at all.

78.      From August 2019 to February 2020, Morgan was not enrolled in school.  Prior to August 2019, Morgan was enrolled in a school in Mecklenburg County. After his placement disrupted in August 2019, he was sent to another placement in Gaston County and referred to a day treatment facility there. DSS failed to reenroll Morgan in a school in Gaston County.

79.     The day treatment facility did not have an Individualized Education Program ("IEP") for Morgan. Morgan did not have an IEP because he was not enrolled in any school. While some children in day treatment received instructional materials from their schools, Morgan was given crossword puzzles. When he was not doing crossword puzzles, he would sleep or go the gym.

80.     Morgan also faced physical and emotional abuse in the foster home where DSS placed him in August 2019. Specifically, Morgan's then-foster parent would send him to day treatment in a diaper even though he was 12 years old. Morgan had been wearing a diaper at night for anuresis and to prevent him from digging into his rectum (a possible indication of sexual trauma that no one has ever fully explored). Morgan's foster parent would not pack any additional diapers for Morgan at the facility, and stated that Morgan needed to sit in his soiled diaper to teach him a lesson because he "knew better."

81.     Morgan also complained that this foster parent subjected him to various forms of punishment, including hitting him and making him sit in the corner by himself. Although DSS removed Morgan after he reported the abuse, this maltreatment further traumatized Morgan.

82.     At the time, DSS did not have any available appropriate placements for Morgan in North Carolina. So in February 2020, DSS sent Morgan to an out-of-state PRTF in South Carolina. Morgan's social worker recommended against sending Morgan to a PRTF because he did not meet the criteria for psychiatric residential treatment.

83.     DSS did not provide the out-of-state PRTF with a copy of Morgan's IEP and, thus, did not implement it. During this period, DSS also did not provide the PRTF with a comprehensive summary of Morgan's mental health needs or of his educational history.

84.     Morgan remained at the PRTF until April 2022. Morgan remained at the PRTF because DSS could not find a placement for him in North Carolina, not because there was a clinical recommendation for placement in a PRTF.

85.     In or around April 2022, Morgan was transferred to a new placement in North Carolina – an alternative family living home ("AFL") or a home licensed to provide services to

children with intellectual and developmental disabilities. Although this was a better placement setting for Morgan than the out-of-state PRTF, his educational needs continued to be neglected.

86.     Upon his return, Morgan was enrolled in an alternative school setting for children who had been suspended or expelled from the regular school system due to behavioral issues. The environment was not conducive to supporting children with intellectual disabilities like Morgan, and DSS failed to provide Morgan with any support to aid this transition back to school. Morgan had spent many years without any formal education and was provided with no additional support to prepare him to return to school. Unsurprisingly, the transition to a more traditional educational environment was a failure and he only attended for a short time before he experienced another crisis.

87.     Within weeks of his placement transfer, Morgan had an emotional outburst and got into an altercation with his new foster parent. Morgan's behavioral outburst escalated when he hurt his foster parent's dog and threatened to hurt her. As a result, he was transported to the Emergency Room at Davis Regional Medical Center in Statesville. The hospital was not a psychiatric facility, nor did it have a children's unit. It was wholly unequipped to address Morgan's needs.

88.     On multiple occasions, the hospital determined that it was no longer medically necessary for Morgan to remain in the hospital. Hospital staff contacted DSS, but DSS refused to pick up Morgan because DSS had no other placement for him. Morgan languished in the hospital for weeks, without adequate care or support, and without any effort to continue his educational instruction.

89.     Due to the lack of adequate care and support, Morgan's behavior continued to escalate, leading him to be involuntarily committed and prolonging his hospital admission.

90.     The hospital was not a safe placement for Morgan. Morgan is prone to running away when he is emotionally disturbed. But because the hospital is not a locked facility and does not specialize in children with behavioral disorders. Withough locked doors or continuous supervision, Morgan ran away from the hospital multiple times, sometimes several times in a single day.

91.     Morgan's flights from the hospital brought him into grave danger. On one occasion, he ran barefoot across an interstate highway, risking collision with oncoming traffic, and suffering abrasions all over his feet.

92.     On another occasion, he ran away and jumped into a stranger's car. The stranger eventually returned Morgan to the hospital.

93.     Morgan's lack of adequate supervision or care at the hospital and his frequent abscondments led to numerous run-ins with law enforcement. The hospital regularly called the police because of Morgan's outbursts and the police often used force to restrain him. On one occasion, several officers immobilized Morgan in the middle of the street by sitting on his body.

94.     Morgan's condition deteriorated so significantly in the hospital that members of his care team perceived that if he remained in the hospital any longer, he was at risk of serious harm or even death. After nearly two-weeks in the hospital, an intervention led by hospital administrators caused DSS to remove Morgan from the hospital and place him in another AFL.

95.     Morgan remained in the AFL for approximately one year. Due to his foster parent's personal circumstances, Morgan was moved to another AFL in the summer of 2023. Due to years of educational neglect, Morgan is well below grade level. Years of instability and emotional neglect, as well as his recent traumatic hospital admission, have also taken their toll, and he continues to be at risk of a placement disruption due to his unmet behavioral and emotional needs.

Morgan is only a few years away of aging out of the foster care system and DSS has no made plans for him to obtain permanency.

96.     As a direct result of Defendants' actions and inactions, Morgan has suffered and continues to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Morgan's case, and not acted with deliberate indifference to his legal rights, Defendants may have prevented Morgan's condition from deteriorating while in state custody. Morgan remains at risk of deterioration due to placement instability, lack of appropriate services, and delayed permanency.

**Sara M., Leah M., and Harry M.**

97.     Sara, Leah, and Harry are siblings from Alleghany County. They appear in this action through next friend, Kari Danforth. Kari adopted one child from out of state and fostered ten children in North Carolina. She was selected as "Foster Parent of the Year" by Children's Home Society. Kari is very familiar with North Carolina's foster care system. She has acquainted herself with the allegations in the Complaint regarding Sara, Leah, and Harry's experiences in foster care and is dedicated to their best interests.

98.     DSS took the siblings into custody in February 2022 due to their parents' substance abuse and domestic abuse problems. Sara was seven years old, Leah was six, and Harry was three.

99.     The siblings were placed in Ebenezer Christian Children's Home.

100.    Upon information and belief, DSS did not make reasonable efforts to contact relatives or other kin with whom the children could be placed before sending them to the group home. DSS ignored prior communications with the children's maternal grandmother, Mrs. B., who

previously had notified DSS that she would be able to take the children in the event that a removal occurred. No one from DSS contacted Mrs. B after the removal.

101.    Mrs. B contacted DSS immediately after learning of the children's removal. She requested to speak to and visit the children. She stated that she and her husband had been in frequent contact with the children up until February and it was important for the children to know that "Grampa and Nana are still available." DSS responded, "We typically do not approve visits or telephone calls with grandparents."

102.    Mrs. B made several inquires: why DSS was denying contact with her grandchildren, why the children were placed at Ebenezer and whether they were receiving any specific counseling or care there, why she was not immediately contacted upon removal. She received no response to these inquiries. After a month of repeated attempts, she was granted contact with her grandchildren.

103.    At a permanency hearing, the court ruled that the three children could reside with their grandparents. But DSS kept the children at Ebenezer Christian Children's Home until they completed the school year.

104.    When Mrs. B picked up the children from the group home, DSS was not present to discuss the children's permanency status, their experience at the group home, or their current mental and emotional state. She was informed that the children would be held back a year academically.

105.    The children lived with Mrs. B and her husband until May 2023. They began the process of becoming licensed as a kinship placement. The children's permanency plan was changed from reunification to guardianship. The children's biological parents refused to sign

guardianship forms, and did not undergo required drug testing or domestic violence assessments. Instead, they appealed the children's removal.

106.    Under the guardianship plan, DSS required the grandparents to supervise visitations with the children's biological parents. After every visitation, the children were emotionally disturbed and experienced repercussive behavioral issues. Mrs. B witnessed how these visitations were traumatizing to the children and requested that DSS cease them. DSS refused. The grandparents declined to become guardians.

107.    Shortly before the grandparents completed the foster care licensing process, DSS suddenly removed the children from their grandparents and placed them with their aunt and uncle.

108.    The children lived with their aunt and uncle for five months. During that time, the aunt and uncle also observed how distraught the children were following visitations with their biological parents. They expressed an interest in adopting the children so that they could give them a permanent home and terminate the visitations that caused them so much distress. DSS declined to pursue adoption. The caseworkers told them that the guardianship paperwork was already proceeased and that adoption would take too long. DSS did not indicate that guardianship was in the best interest of the children.

109.    At a court hearing, DSS informed the court that the parties had agreed that the permanency plan for the children was guardianship with the aunt and uncle. The possibility of adoption was not mentioned at all, nor were the concerns regarding parental visitations. The court approved the guardianship plan with the aunt and uncle. The court was never apprised of their desire to adopt the children, nor of the issues with continuing contact with their biological parents,

110.    After several months caring for the three siblings in addition to their three biological children, the aunt and uncle determined that they could no longer financially support Sara, Leah,

and Harry without assistance. The aunt and uncle expressed that they were still willing to adopt the children, but DSS said that adoption was no longer an option because the court approved guardianship. DSS also said that it lacked authority to pursue adoption as an alternative to guardianship.

111.    In October 2023, DSS abruptly terminated the children's placement with the aunt and uncle and moved them to the home of their paternal grandmother.

112.    The children began experiencing problems in their new placement almost immediately. Whereas they previously lived in a stable, loving, and supportive environment, they were exposed to violence and instability in their paternal grandmother's home. The children's half-brother already resided in the home. He was troubled and prone to violence, and he bullied Sara. The children's father also had a history of domestic violence. Although there was a restraining order in place prohibiting contact with the children, their grandmother nevertheless allowed her son to visit the home due to his relationship with their half-brother. This further destabilized the children.

113.    During conversations with the aunt and uncle, Sara complained of being bullied by her half-brother. She also stated that she did not want to live there and wanted to run away.

114.    The children were permitted to visit Mrs. B during Christmas 2023. They were happy to be reunited with their maternal grandparents and aunt and uncle. But their mental and emotional state had clearly deteriorated since they went to live with their paternal grandmother. When their visit was coming to an end, Sara threatened to run away or hurt herself if she was forced to return to her paternal grandmother's home.

115.    In January 2024, DSS removed the children from their paternal grandmother's home and returned them to Ebenezer Christian Children's Home. The children did not have any of their clothes or belongings from before being placed at the group home.

116.    The children have remained in the group home ever since. DSS has not facilitated contact with the maternal grandparents or aunt and uncle other than a court-ordered monthly 15-minute phone call. DSS said that they didn't want the children to become more attached to the maternal grandparents.

117.    The maternal grandparents have expressed their desire to adopt the three children. They have repeatedly asked for the children to come back to live with them in the interim while DSS works towards a permanency plan. DSS has refused these requests. DSS has kept these three children, all under the age of 10, in a congregate care facility despite the immediate availability of a safe, stable, and loving kinship placement with their maternal grandparents. DSS has restricted the children's contact with their relatives despite the nurturing and supportive role that their maternal grandparents and aunt and uncle have in their lives.

118.    At a recent permanency hearing, when asked why the children were in a group home rather than in kinship placements, DSS responded that the kids are happy at Ebenezer Christian Children's Home, and that the children are "saved" and want to be baptized. The children's parents do not support the apparent religious indoctrination the children are enduring at Ebenezer Christian Children's Home.

119.    DSS has not plans to change placement. The next permanency hearing is scheduled for January 2025.

120.    As a direct result of Defendants' actions and inactions, Sara, Leah, and Harry have suffered and continue to suffer emotional and psychological harm. If Defendants had made

reasonable professional judgments, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of their case, and not acted with deliberate indifference to their legal rights, Defendants may have prevented Sara, Leah, and Harry from deteriorating while in state custody. Without relief, Sara, Leah, and Harry will be at ongoing risk of placement instability, lack of appropriate services, delayed permanency, and religious indoctrination contrary to their parents' wishes.

**Sylvia T.**

121.    Sylvia T. is a 13-year-old girl from Randolph County. Sylvia appears in this action through her next friend, Anne Richey. Anne Richey is a registered nurse and licensed foster parent. Anne fostered Sylvia from September 2023 to March 2024. Ms. Richey has acquainted herself with the allegations in the Complaint regarding Sylvia's experience in foster care and is dedicated to her best interests.

122.    Sylvia was born in August 2011. In the following years, her mother and father were convicted of child abuse. Shortly before Sylvia turned 8, her mother was again convicted of child abuse, and DSS placed Sylvia with her paternal grandmother.

123.    During the next four years in the grandmother's home, Sylvia suffered severe emotional and physical abuse. As a form of punishment, the grandmother forced Sylvia to watch as she shot and burned Sylvia's three dogs.

124.    After this incident of child abuse and animal cruelty, Randolph DSS removed Sylvia. Sylvia disclosed additional abuse during the forensic interview.

125. In September 2023, following Sylvia's removal and after one night in an emergency placement, DSS placed Sylvia in Ms. Richey's home.

126. Sylvia developed a strong bond with Ms. Richey and her family, and Ms. Richey became Sylvia's most trusted advocate.

127. When Ms. Richey requested an assessment for an individualized education program (IEP) or 504 plan for Sylvia, DSS rejected the idea, noting that "Sylvia's just choosing not to do the work."

128. Sylvia had endured a lifetime of trauma and was in dire need of specialized medical treatment. She suffered from anxiety, depression, suicidal ideation, PTSD, eating disorder, self-harm, and sleep disturbances. She also had difficulty concentrating in school, completing assignments, planning, organizing, and studying. And her trauma made it difficult to form trusting relationships with her peers and adults.

129. Recognizing the need for treatment, Ms. Richey repeatedly requested that DSS secure additional therapy services beyond the weekly therapy visits that she had arranged. DSS did not do so.

130. On March 29, Sylvia was admitted to in-patient treatment at the hospital due to self-harming behaviors and suicidal ideation. Anne visited her every day, and DSS encouraged communication between Ms. Richey and Sylvia.

131. DSS requested that the hospital provide a recommendation for placement and the hospital declined to make any recommendation.

132. Several days later, DSS transferred Sylvia to a crisis facility, Daymark, for a 30-day assessment. Sylvia did not want to remain at the facility. Upon information and belief, Daymark is intended to be a short-term stay facility where 30-day assessments are conducted, not

a long-term care facility. But Sylvia remained in the facility for over 60 days because DSS could not find an appropriate placement. During this time, Sylvia was not receiving her regular therapy, and she was not receiving an education.

133.    Communication between Ms. Richey and Sylvia was suddenly and drastically reduced.  Sylvia was allowed to speak with Anne over the phone for 10 minutes each day. Soon after, phone calls were reduced to three times per week. Two months after placement at the facility, with no explanation, DSS terminated all communication between Sylvia and Ms. Richey. Ms. Richey was not permitted to visit Sylvia in the facility. Nor were Sylvia's biological aunt and her uncle, who reached out to DSS multiple times to try to set up a visit. Sylvia's only in-person contacts outside of the facility were occasional visits with DSS and the Guardian Ad Litem.

134.    Anne had contacted the school to inform them that Sylvia was hospitalized.  Weeks later the school contacted Ms. Richey to check on Sylvia's status. DSS had not communicated with the school about Sylvia's condition. DSS did not request accommodations to enable Sylvia to continue her education while at the facility.

135.    While at the facility, Sylvia was physically assaulted and sent to the hospital for a CT scan. Sylvia was physically assaulted again, but the facility did not seek medical attention for Sylvia.

136.    DSS was searching for a therapeutic foster home. Knowing this, Ms. Richey completed training to obtain a therapeutic foster care license. Nevertheless, DSS refused to consider returning Sylvia to Ms. Richey's home.

137.    After two months at Daymark, DSS placed Sylvia in a therapeutic foster home in Scotland County, her fourth placement in a year. At this placement, DSS failed to obtain therapy

for Sylvia.  In July 2024, DSS moved Sylvia to a therapeutic foster home in Cumberland County, her 5th placement.

138.    DSS's permanency goal is reunification. But DSS does not have a plan to safely reunify Sylvia with her parents. Sylvia is terrified of returning to her mother. She wishes to inform the judge about her concerns, but DSS has not allowed her to attend the hearings or participate remotely.

139.    DSS has not shared with Sylvia a plan for her ongoing mental health care.  DSS has not provided educational services for Sylvia from April 2024 to August 2024.

140.    Sylvia had a court hearing on November 6, 2024. At that time, her Guardian Ad Litem stated that in October Sylvia had been placed back at the same Daymark facility where she had been physically assaulted and was receiving no educational services. Sylvia is again receiving no educational services at the facility or her much needed trauma therapy.

141.    As was the case during her previous stay at Daymark, Sylvia also has not been permitted visitation from Anne. Sylvia's biological aunt and uncle reached out to DSS multiple times to try to set up a visit, but they were not permitted to visit Sylvia either.  Sylvia's only visits are from her DSS social worker and her Guardian Ad Litem. Her isolation and alienation from everyone in her support network has contributed to her depression and exacerbated her psychological and behavioral issues.

142.    As a direct result of Defendants' actions and inactions, Sylvia has suffered, and continues to suffer, emotional and psychological harm. If Defendants had exercised reasonable professional judgment, provided timely and appropriate medical treatment, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Sylvia's case,

and not acted with deliberate indifference to her legal rights, Defendants may have prevented Sylvia's condition from deteriorating while in state custody.

143.    Sylvia remains at risk of continuing deterioration due to placement instability, lack of appropriate services, and delayed permanency.

**Ava J.**

144.    Ava J. is an 8-year-old girl from Davidson County who has been in foster care for two years. Ava appears in this action through her next friend, Kayla DeWald. Kayla DeWald was a foster parent for two years before she terminated her license. She fostered 12 children of all ages through Davidson County and she adopted two children. Kayla DeWald served as a respite placement for Ava. Kayla DeWald has acquainted herself with the allegations in the Complaint regarding Ava's experience in foster care and is dedicated to her best interests.

145.    In November 2022, Ava and her two younger siblings (one 18 months old, the other approximately three years old) were removed from their home due to abuse by their biological parents.

146.    Ava also has two older siblings, who were removed from their parents' custody at an earlier date.

147.    In the two years that Ava has been in DSS custody, she has had three DSS caseworkers.

148.    Ava and her younger siblings were initially placed together in a foster home. Their biological parents voluntarily relinquished their parental rights to the youngest sibling so that the foster family could adopt him.

149.    The foster family also wants to adopt Ava, and the biological parents wish to voluntarily relinquish their parental rights so that the foster family can also adopt Ava; however,

DSS removed Ava from the foster family's custody in October 2023 and moved her to another foster home.

150. When Ava went to her first foster family in November 2022, the foster parent arranged weekly therapy for Ava. Ava was diagnosed with Oppositional Defiant Disorder ("ODD"), Attention Deficit/Hyperactivity Disorder ("ADHD"), and Post-Traumatic Stress Disorder ("PTSD").

151. After several months, Ava had an altercation at the foster home and hit another foster child. As a result of this one incident, DSS decided to increase her level of need from Level I to Level II.

152. On Sept. 25, 2023, Ava's therapist wrote a letter recommending additional services that would allow Ava to learn emotional regulation while maintaining the stability of the foster home and remaining together with her siblings, instead of moving Ava to a Level II foster home. She recommended twice weekly therapy, intensive in-home therapy services, and medication management.

153. DSS did not follow the therapist's recommendations and never attempted to implement additional services at the home where Ava had lived with her siblings for 11 months. Instead, DSS told the therapist to recommend moving Ava to a Level II foster home.

154. The therapist responded that moving Ava to a Level II foster home was the best option "**if** [the recommended] resources were not going to be utilized." (emphasis added).

155. In October 2023, DSS placed Ava in a Level II therapeutic foster home in Charlotte, NC, approximately an hour away from all four of her siblings, who have all been placed in or adopted by families in Davidson County.

156.    At the time DSS moved Ava, DSS claimed that they had already arranged for a therapist and a specialist at the new home. However, as of January 2024, three months after the move, DSS still did not have therapy for Ava at the new home.

157.    Though DSS maintained sibling visits at first, DSS has not brought Ava to visit her siblings since July 2024.

158.    DSS has now forbidden communication between Ava's current foster parents and former foster parents (the adoptive parents of her younger sibling).

159.    DSS is attempting to monitor communications between the biological parents and her younger brother's adoptive parents, including requesting screenshots of text conversations regarding her brother, who is no longer in DSS custody.

160.    The former foster parent's social worker told her that if continued to fight for Ava, it could be held against her and she would not be approved for future adoptions.

161.    As a direct result of Defendants' actions and lack of action, Ava has suffered and continues to suffer harm. Defendants have failed to provide a constitutionally adequate level of care, departed from professional judgment, not provided timely and appropriate services, and they have acted with deliberate indifference. Due to Defendants' actions, Ava's health continues to deteriorate due to forced separation from her siblings, to instability in her home situation, and to delayed services. Were it not for Defendants' actions, Ava would have received the professionally recommended services necessary for her mental health and achieved permanency through adoption in a stable home with one of her biological siblings.

**Rene S.**

162.    Rene S. is a 6-year-old girl from Rockingham County. Rene appears in this action through her next friend, Jackson Albert. Mr. Albert is an undergraduate student at the University

of North Carolina Chapel Hill. He grew close to Rene while she was placed in his parents' home, and he considers himself Rene's older brother. Mr. Albert has acquainted himself with the allegations in the Complaint regarding Rene's experience in foster care and is dedicated to her best interests.

163.     Rene has an 8-year-old brother. Both siblings were removed in February 2024 due to physical abuse at the hands of their stepfather.

164.     Rene and her brother spent approximately seven weeks in one foster home before they came in April to live with Mr. Albert's family: his mother, father, and sibling. Mr. Albert's mother, Mrs. Albert is a former social worker and licensed foster parent.

165.     Within a month after their arrival, Mrs. Albert caught the two siblings performing sexual acts on one another. She immediately notified Rockingham County DSS by calling the crisis hotline. Mrs. Albert and her husband decided to put the two siblings in separate bedrooms as they had previously shared a room. This necessitated one of their biological children to sleep on the sofa.

166.     Eventually, the situation became untenable, and they decided to ask DSS to move Rene's brother to a new placement in August 2024. DSS initially could not find him a placement, but after a week they moved him to a temporary placement. Between August and the date of this filing, he has been moved to new placements at least three times. In October, he was moved to a more "permanent" placement, which is two hours away from his sister.

167.     When they came to the Alberts home, both children were wearing pull up diapers and their skin was covered in blisters from sitting in their own urine all day. Rene could barely speak and her speech was so unintelligible that her brother had to translate for her. Rene could not even count to ten.

168.     Since Rene has been with the Alberts, she has thrived. Her speech has exploded. She can now count into the 30s, knows her ABCs, and can spell and write her own name. The Alberts enrolled her in a private kindergarten because she was so academically behind. There are only 8 children in the classroom and Rene has greatly benefited from the small classroom setting.

169.     In April, the Alberts immediately requested speech therapy for Rene, but she was on a waitlist for several months and only just began speech therapy in October.

170.     Rene developed a trusting relationship with Mrs. Albert. Rene eventually revealed that she endured repeated sexual abuse at the hands of her stepfather. Rene provided specific and concrete details about her experiences, indicating to Mrs. Albert that she was telling the truth about the horrific abuse she endured. Mrs. Albert reported the sexual abuse to Rockingham County DSS and Rene's assigned DSS caseworker. Mrs. Albert asked DSS for a forensic interview to explore Rene's sexual abuse, but DSS refused. Upon information and belief, DSS has not formally acknowledged Rene's history of sexual abuse.

171.     Rene has supervised visits with her mother and stepfather for two hours on Wednesday evenings at the Rockingham County DSS office. September 11, 2024, was the first time that she had a supervised visit without her brother, who participated via zoom due to the distance from his new placement. A few days after the visit, Rene had an emotional meltdown and confessed to Mrs. Albert that her stepfather had touched her in her private area during their last visit. She said that it occurred while her stepfather was rocking her. Mrs. Albert consoled Rene and told her it was not her fault.

172.     Mrs. Albert reported the incident to their social worker. The social worker responded that Rene was probably just confused and that kids get things mixed up.

173.   Rene had another supervised visit that week. Before she went to the visit, Mrs. Albert encouraged her to stay, "stop, please," if her stepfather tried to touch her inappropriately during the visit. When Mrs. Albert picked her up that evening, Rene told her that nothing happened. However, the next day, Rene was hiding behind her book as if she was embarrassed. She confessed that she was sorry, but she was not actually a brave little girl because her stepfather did touch her during the visit, and she was too scared to tell him to stop. She provided details about how he did it—he held her on his lap and had his fingers under her in a way in which he was able to touch her private area.

174.   When Mrs. Albert reported this to the social worker, the social worker said her hands were tied. The Rockingham County DSS office took no action.

175.   Mrs. Albert called a children's advocacy group and a child therapist. Both professionals advised her that based on her knowledge of these facts, she had a mandatory obligation to file a police report.

176.   Mrs. Albert informed the DSS social worker that she intended to file a police report. The social worker contacted the Rockingham County DSS office to notify them that a report would be filed.

177.   Within an hour, Mrs. Albert received a call from the DSS office notifying her that Rene would be removed from their home. Mrs. Albert understood this to be retaliatory action in response to her intention to file a formal police report and more generally her advocacy for Rene.

178.   Mrs. Albert learned that a woman, whom Rene had never met before, came to her school to pick her up and took her to a new placement without saying goodbye to the Alberts or bothering to retrieve her clothes or medication, including an Epi-pen for emergencies.

179.     The sudden change was devastating and destabilizing. Rene had been making friends. She had birthday parties she planned to attend that weekend. She had just begun speech therapy after months of being on a waitlist. Rene was thriving in the Alberts home, and was healing from her trauma in a loving, supportive, and stable home environment.

180.     During the period Rene lived with the Alberts (from April 2024 to October 2024), they cycled through 4 to 5 social workers, none of whom remained long enough to learn Rene's case sufficiently. One social worker was moonlighting as a social worker with Rockingham DSS and so was only available to speak with the Alberts at night.

181.     Mrs. Albert filed the police report, considering her moral obligation to try to protect Rene from the sexual abuse she was enduring at the hands of her stepfather—to which Rockingham DSS was shockingly indifferent. Moreover, Rockingham DSS affirmatively caused harm to Rene by unnecessarily and capriciously removing her from a stable and loving home in which she was thriving.

182.     After Rene's removal, Mrs. Albert communicated with the former foster mother with whom Rene and her brother lived prior to coming to the Alberts. Their former foster mother was stunned when she learned that Rockingham DSS had not informed Mrs. Albert about the children's history of sexual abuse. The prior foster parent said that Rene's brother had confided in her numerous times regarding the sexual abuse he endured from the children's stepfather. She had reported it to the children's social worker and his supervisor. Despite these reports, DSS did not formally document the sexual abuse. Nor did they notify the Alberts when the children came to live with them.

183. Echoing the retaliation against Mrs. Albert, the children were removed from the prior foster home shortly after their foster mother began asking questions regarding the sexual abuse.

184. These events underscore Rockingham DSS's deliberate indifference to Rene's wellbeing, and the manner in which their actions are guided not by the best interest of the child, but by expediency, willful blindness, and retaliatory animus.

185. As a direct result of Defendants' actions and inactions, Rene has suffered, and continues to suffer, emotional and psychological harm. Defendants failed to exercised reasonable professional judgment, failed to respond to credible allegations of abuse, made affirmatively detrimental case planning and placement decisions that run counter to the goals of foster care—safety, stability, and permanency, and acted with deliberate indifference to Rene's legal rights.

186. Rene has been needlessly subjected to placement instability, a lack of appropriate services, delayed permanency, and potential ongoing sexual abuse by her stepfather all to avoid dealing with an obvious and critical danger to Rene and the avoidable trauma of removing her from a supportive home and stable foster home.

**Alice B.**

187. Alice B. is a 16-year-old girl from Harnett County. She has spent over half of her life in DSS custody, and she has been a legal orphan for more than six years. Alice appears in this action through her next friend, Kimberly Crothers. As a foster child herself, Ms. Crothers knows first-hand the experiences that Alice is going through. And throughout Alice's time in foster care, Ms. Crothers has encouraged Alice to stay positive and persevere. Ms. Crothers has acquainted herself with the allegations in the Complaint regarding Alice's experience in foster care and is dedicated to her best interests.

188.    In August 2014, Harnett DSS removed Alice from the custody of her father and stepmother based on allegations of neglect. At that time, Alice's biological mother was incarcerated in Pennsylvania.

189.    In November 2017, Alice's father voluntarily relinquished his parental rights. In May 2018, Alice's mother's parental rights were terminated. At that time, Alice was ten years old. Now, over six years later, Alice remains a legal orphan.

190.    Since she was removed in 2014, DSS has moved Alice over eighteen times, cycling her through a serious of foster homes, group homes institutions, and out-of-state facilities. Alice spent four months in a PRTF in South Carolina, two months in in-state crisis centers and PRTFs, one year in a cottage community, and over two-and-a-half years in group homes. During a two-month period in 2023, DSS moved Alice five times.

191.    Alice suffered serious physical, sexual, and emotional abuse. When Alice became a legal orphan in May 2018, she was placed in a pre-adoptive home with her two siblings. Her oldest brother repeatedly sexually molested her. When she reported this to the foster mother, the she locked the siblings in a closet for "family therapy" and instructed them to work it out. The abuse did not stop. Upon information and belief, after Alice reported the sexual abuse to her caseworker, Alice was removed and placed in an institution.

192.    In one group home, Alice was confined to her room and was constantly concerned about the lack of adult supervision. She feared violence and sexual abuse from other foster children in the group home. Afraid for her safety, Alice ran away from the group home.

193.    The placement instability and safety threats have caused Alice's condition to deteriorate significantly. She runs away frequently, engages in self-harming behaviors, and struggles in school.

194. In October 2024, Alice ran away from a group home. During this time, Alice was forced into unsupervised visits with the brother who sexually abused her and the pre-adoptive family that ignored the abuse.

195. On October 11, Alice appeared at a court hearing. At the end of the hearing, Alice was taken back into Harnett DSS custody. Alice pleaded that she would rather go to jail than return to Harnett DSS custody.

196. On November 12, one week before her permanency hearing, Harnett DSS placed Alice in New Hope, a PRTF in South Carolina. She is blocked from communicating with anyone outside the facility, and she is being denied off-campus time due to her runaway history.

197. Harnett DSS requested that the permanency plan remain adoption or guardianship. But upon information and belief, Harnett DSS is doing nothing to accomplish either goal.

198. As a direct result of Defendants' actions and inactions, Alice has suffered and continues to suffer emotional and psychological harm. If Defendants had made reasonable professional judgments, engaged in reasonable case planning and placement matching, equipped caseworkers with a reliable information system, not acted in disregard of reasonable professional standards as to the management of Alice's case, and not acted with deliberate indifference to her legal rights, Defendants may have prevented Alice's condition from deteriorating while in state custody. Alice remains at risk of deterioration due to placement instability, unjust institutionalization, and delayed permanency.

## II.    **Defendants**

199. Defendant Governor Roy Cooper is the Governor of North Carolina and is sued solely in his official capacity. He is the chief executive of North Carolina and charged with

faithfully executing the laws of North Carolina, as well as administering the daily affairs of the state. Governor Cooper appoints the Director of DHHS, who serves on his cabinet.

200.     Defendant North Carolina Department of Health and Human Services (DHHS) is a principal department of the North Carolina Executive Branch with wide-ranging functions, powers, duties, and obligations. DHHS, by and through its various divisions, oversees and operates all aspects of the North Carolina child welfare system. N.C. Gen. Stat. § 108A-1. DHHS supervises all regional and county DSS offices and has non-delegable direct and ultimate responsibility for the care, conditions of custody, placement, and services for all North Carolina youth in foster care, including the Named Plaintiffs and all members of the putative class and sub-classes. *See id.*

201.     Defendant Kody Kinsley is the Director of DHHS and is sued solely in his official capacity. Secretary Kinsley is responsible for DHHS's policies, practices, and operations, and for ensuring that DHHS complies with all applicable federal and state laws. He is statutorily responsibly for supervising the regional and county level administration of North Carolina's child welfare system through local DSS offices. *See id*. Secretary Kinsley also has authority to "adopt and enforce rules" applicable to local DSS offices. N.C. Gen. Stat. § 143B-139.1.

202.     Defendant Susan Osborne is Assistant Secretary for County Operations of the Division of Social Services, the subdivision within DHHS responsible for child welfare. She is sued solely in her official capacity. Secretary Osborne oversees the Division of Social Services and is responsible for the division's policies, practices, and operations, and for ensuring that the division complies with all applicable federal and state laws.

203.     Defendant Mark Payne is the Director of the Division of Health Service Regulation (DHSR), the subdivision within DHHS responsible for overseeing residential treatment facilities in which children are placed. He is sued solely in his official capacity. Director Payne oversees

DHSR and is responsible for the division's policies, practices, and operations, and for ensuring that the division complies with all applicable federal and state laws.

204.    Defendant Gaston County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

205.    Defendant Gaston County DHHS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Gaston County. Steven Eaton is the Director of Gaston County DHHS. He oversees Gaston DHHS's policies, practices, and oprtations, and is responsible for ensuring that Gaston DHHS complies with all applicable federal and state laws.

206.    Defendant Mecklenburg County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

207.    Defendant Mecklenburg County Department of Social Services-Youth and Family Services (Mecklenburg DSS-YFS) is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Mecklenburg County. Kimberly Henderson is the Director of Mecklenburg DHHS. She oversees Mecklenburg DSS-YFS's policies, practices, and oprtations, and is responsible for ensuring that Mecklenburg CFAS complies with all applicable federal and state laws.

208.    Defendant Johnston County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

209. Defendant Johnston County DSS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Johnston County. Christine Dowdell is the current Director of Johnston DSS. She oversees Johnston DSS policies, practices, and oprtations, and is responsible for ensuring that Johnston DHHS complies with all applicable federal and state laws.

210. Defendant Harnett County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

211. Defendant Harnett County DSS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Harnett County. Paul Polinski is the current Director of Harnett DSS. He oversees Harnett DSS policies, practices, and oprtations, and is responsible for ensuring that Harnett DHHS complies with all applicable federal and state laws.

212. Defendant Davidson County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

213. Defendant Davidson County DSS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Davidson County. Patricia Baker is the current Director of Davidson DSS. She oversees Davidson DSS policies, practices, and oprtations, and is responsible for ensuring that Davidson DHHS complies with all applicable federal and state laws.

214. Defendant Rockingham County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

215. Defendant Rockingham County DSS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Rockingham County. Carye E. Dickerson is the current Director of Rockingham County DSS. She oversees Rockingham DSS policies, practices, and oprtations, and is responsible for ensuring that Rockingham DHHS complies with all applicable federal and state laws.

216. Defendant Randolph County is an agency and instrumentality of the State through which the State performs its governmental functions and fulfills its duties under the U.S. Constitution within its territorial limits.

217. Defendant Randolph County DSS is an agency created and authorized under North Carolina law. It is responsible for the safety and welfare of foster children in Randolph County. Tracie Murphy is the current Director of Randolph County DSS. She oversees Randolph DSS policies, practices, and oprtations, and is responsible for ensuring that Randolph DHHS complies with all applicable federal and state laws.

## CLASS ACTION ALLEGATIONS

218. This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

219. This action consists of one general class and one subclass:

220. Each class is sufficiently numerous to make joinder impracticable. The General Class consists of at least 11,000 children who are in the legal and/or physical custody of DSS under the supervision of DHHS and/or with whom DHHS has a special relationship.

a.  A class comprised of all children for whom North Carolina DHHS has or will have legal responsibility and/or a special relationship in the context of the child protection system (the "General Class").

b.  A subclass comprised of all members of the General Class who have or will have emotional, psychological, cognitive, or physical disabilities (the "ADA Subclass").

c.  A subclass comprised of all members of the General Class for whom County Defendants have or will have legal responsibility and/or a special relationship in the context of the child protection system (the "County Subclass").

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

221.   Each class is sufficiently numerous to make joinder impracticable. The General Class consists of at least 11,000 children who are in the legal and/or physical custody of DHHS and/or with whom DHHS has a special relationship.

222.   The ADA Subclass consists of thousands of children with disabilities who are or will become a ward of DHHS.

223.   The County Subclass consists of approximately 2,500 children who are in the legal and/or physical custody of County Defendants and/or whom County Defendants have a special relationship.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

224.   The claims of the Named Plaintiffs are typical of those of the General Class and the ADA Subclass Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

225.   The questions of fact and law raised by named Plaintiffs are common and typical of each putative member of the classes whom they seek to represent.

226. Questions of fact common to the General Class include:

   a. whether state Defendants fail to maintain a case management system capable of adequately protecting foster children;

   b. whether state Defendants fail to adequately supervise county DSS;

   c. whether state and county Defendants fail to recruit and retain sufficient number and diversity of foster care homes;

   d. whether state and county Defendants fail to maintain a system that protects foster children from physical, psychological, and emotional harm;

   e. whether state and county Defendants fail to maintain a system that provides permanency to foster children within a reasonable period of time;

227. Questions of fact common to the ADA Subclass include:

   a. whether state Defendants have violated the rights of the plaintiffs within the ADA Subclass by supervising the State's foster care system in a manner that denies qualified children with disabilities the benefits of the State's services, programs, or activities in the most integrated setting appropriate to their needs, and by failing to reasonably modify the State's foster care system to avoid discrimination against children with disabilities.

228. Questions of fact common to the County Subclass include:

   a. whether county Defendants fail to recruit and retain sufficient number and diversity of foster care homes;

   b. whether county Defendants fail to maintain a system that provides permanency to foster children within a reasonable period of time;

229.    The claims of the Named Plaintiffs are typical of those of the Class and subclass , as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

230.    Questions of law common to the General Class include:

    a.    whether state Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997;

    b.    whether state Defendants' systemic failures, including its deliberate decision to not establish mandatory performance metrics, violate the Due Process Clause of the Fourteenth Amendment;

    c.    whether state Defendants' systemic failures violate Plaintiffs' right to a permanent home and family, as well as their right to be free from harm and have their basic needs met under the First, Ninth, and Fourteenth Amendments to the U.S. Constitution.

    d.    Whether county defendants violate state law by failing to comply with caseload standards for caseworkers, in accordance with 10A NCAC 70G.0501

231.    Questions of law common to the ADA Subclass include:

    a.    whether state Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the respective implementing regulations; by unnecessarily placing youth with disabilities, or placing them at risk thereof, in institutional settings and denying them access to meaningful, individualized, and appropriate community-based treatment and supports.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

232.    The named Plaintiffs will fairly and adequately protect the interests of the classes that they seek to represent. Defendants have acted or failed to act on grounds generally applicable to all members of the classes, necessitating class-wide declaratory and injunctive relief. Counsel for Plaintiffs know of no conflict among the class members. The named Plaintiffs and Plaintiff Children are represented by counsel experienced in class action litigation, child welfare litigation, and complex litigation.

      a.   Marcia Robinson Lowry, David Baloche, Laura Welikson, and Robyn Goldberg, attorneys with A Better Childhood, Inc., a non-profit legal organization, which has extensive experience and expertise in federal child welfare class action litigation actions throughout the U.S.;

      b.   Christopher J. Blake and D. Martin Warf, attorneys with Nelson Mullins, which has extensive experience and expertise in federal class actions throughout the U.S.

### Fed. R. Civ. P. 23(b)(1)(A) and (B)

233.    This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of General Class members is approximately 11,000, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

234.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the Classes, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class.

## STRUCTURE OF THE NORTH CAROLINA CHILD WELFARE SYSTEM

235.    North Carolina is a state-supervised, county-administered child welfare system. The state agency—North Carolina Department of Health and Human Services ("DHHS")—and the 100 county departments of social services ("county DSS") share responsibility for the safety and wellbeing of children in foster care.

## I.    DHHS

236.    DHHS is "the sole state agency responsible for administering or supervising the administration of the Child Welfare Services Program in North Carolina." DHHS is responsible for supervising all 100 county DSS. G.S. § 108A-1, -71, -74. DHHS must enter into written agreements with county DSS specifying "mandated performance requirements and administrative responsibilities"; if a county DSS fails to comply with the written agreement or mandated performance requirements, DHHS must implement a corrective action plan, and if the county DSS fails to comply with the corrective action plan, DHHS must "temporarily assume all or part of the department's social services administration" and "develop and implement a corrective plan of action." G.S. § 108A-74(a2), (a3), (c), (j). Alternatively, DHHS must assume control of social services administration when DHHS determines that a county DSS "is not providing child protective, foster care, or adoption services in accordance with State law…or fails to demonstrate reasonable efforts to do so, and the failure to provide the services poses a substantial threat to the safety and welfare of children in the county." G.S. § 108A-74(h).

49

237.     DHHS is responsible for developing statewide training programs for County DSS (G.S. § 108A-71, -74).

238.     Foster parent licensing, recruitment, and retention processes are shared between the state and counties. DHHS is responsible for: "[e]stablishing state licensure standards and state policy for how counties will work with foster and adoptive parents; [e]stablishing statewide board rates and participating '50-50' with the counties in paying the non-federal share of the rates; [r]eviewing applications for licensure submitted by county or private provider agencies; [c]ollecting and maintaining data on licensed foster homes and licensing actions; and [d]eveloping a statewide diligent recruitment and retention (DRR) plan and working with each county to develop county DRR plans." NC APSR 2023 at 66; G.S. § 131D-10.3, 10.6.

239.     DHHS, county DSS, and Local Management Entity/Managed Care Organizations (LME/MCOs) share responsibility for providing health services to children in foster care. LMEs "are responsible for the management and oversight of the public system of mental health, developmental disabilities, and substance abuse services at the community level," and must "plan, develop, implement, and monitor services within a specified geographic area." G.S. § 122C-115.4. DHHS is responsible "for the coordination of public services between area authorities, county programs, and State facilities," and for ensuring that LME/MCOs are properly managing behavioral health services. G.S. § 122C-111, 124.2. When a county DSS "wishes to disengage from a local management entity/managed care organization," DHHS must, among other things, ensure that the "[p]rovision of services is not disrupted by the disengagement." G.S. § 122C-115(a3)(1). DHHS must implement a corrective action plan or assume direct control of operations when minimally adequate services are not being provided by LME/MCOs. G.S. § 122C-124.1.

DHHS is also responsible for determining how appropriated funds will be allocated throughout the state. G.S. § 122C-147.1.

## II.    COUNTY DSS

240.    County DSS have statutory duties and responsibilities to "administer the programs of public assistance and social services"; "appoint necessary personnel"; "assess reports of child abuse and neglect and to take appropriate action to protect such children"; "accept children for placement in foster homes and to supervise placements for so long as such children require foster home care." G.S. § 108A-14. Binding regulations promulgated by DHHS define the duties and responsibilities of county DSS regarding personnel and caseload standards (10A NCAC 70G .0501), out-of-home placement procedures (10A NCAC 70G .0503), and case management services (10A NCAC 70G .0504). County DSS must also enter into agreements with LME/MCOs to provide health services to children in foster care. G.S. § 122C-115, -115.2.

241.    State law requires that "Social Workers or Case Managers serving children in family foster homes shall serve no more than 15 children.  Social Workers or Case Managers serving children in therapeutic foster homes shall serve no more than 12 children."  (10A NCAC 70G.0501)

242.    County DSS are responsible for "recruiting, training, and supporting foster parents," as well as "recommend[ing] the licensure of foster homes to [DHHS]." 10A NCAC 70G .0402(11). County DSS "complete licensure applications that are submitted to NC DSS for review and approval"; and "[p]rovide ongoing training and support to foster parents who are licensed." County DSS are also responsible "for providing case management to children placed in foster homes and for conducting regular visits with children and foster parents in the homes."

## WIDESPREAD SYSTEMIC ISSUES IN NORTH CAROLINA'S CHILD WELFARE SYSTEM CONTINUE TO HARM ITS FOSTER CHILDREN

### I.  Defendants' Policies and Practices Fuel North Carolina's Placement Crisis

243.  Child welfare policy requires that children in foster care reside in family-like environments, in or close to their home communities, and with kin caregivers and siblings whenever possible. Stable and appropriate placement for children in foster care is essential for child safety and wellbeing, and maintenance of family bonds. Without appropriate and supported foster homes, or appropriate specialized treatment programs, agencies must cycle children through homes, institutions, group placements, and other temporary and emergency placements with disturbing frequency. Additionally, the lack of foster homes creates an overreliance on placements that are unsafe and inappropriate for children, including congregate care settings. .

244.  Placement instability produces a cascade of intersecting and compounding harms, including: (i) a disruption of a child's sense of security and attachment to their caregivers; (ii) a reenactment of the trauma of removal; (iii) a reduced likelihood of reunification and exiting from care and an increased likelihood of returning to care after reunification; (iv) a disruption in a child's education; (v) a loss of the opportunity to establish long-term relationships with adults; (vii) an increased risk of abuse and neglect; (viii) a risk of developmental delays or setbacks because of disrupted attachment and inconsistent caregiving; (ix) a greater likelihood of running away from their placements; (x) a disruption of a child's therapeutic relationship with their mental health care provider and gaps in treatment; (xi) an exacerbation of mental health symptoms; (xii) delays in receiving a diagnosis or accessing treatment for mental health conditions; (xiii) difficultly establishing coping mechanisms and adaptive behaviors to manage stress and emotional challenges; and (xiv) increases in rates of juvenile delinquency and institutionalization.

245.     North Carolina has failed to license, recruit, and retain a sufficient number of appropriate foster homes, and to provide necessary supports to those homes, which causes children to be housed in unsafe and inappropriate settings. DHHS acknowledges that the number of children with complex behavioral needs "far exceeds the space and services available to keep them safe, help them overcome crisis and reunite them with family and community," and that the lack of appropriate placements forces the agency to house children in hospital emergency rooms, DSS offices, or hotel rooms. "'Living' in these inappropriate settings compounds the trauma that children experience during separation from their families and natural support systems. The longer children are separated from their families, the less likely they are to be reunified with them, and they run a higher risk of experiencing poor health and social outcomes, including homelessness and involvement with the justice system."

246.     North Carolina's placement crisis has been echoed by numerous DHHS and DSS senior managers and employees. In September of 2022, when DHHS Assistant Secretary for County Operations, Susan Osborne, told county directors of social services departments that the system was in "crisis" and that "there could be a massive class action lawsuit," she was referring to housing children in DSS offices or holding children with emotional and behavioral health needs in emergency rooms beyond discharge because there was nowhere else to place them. Similarly in March 2022, a NC Health News article discussed that foster children "have been even further traumatized in North Carolina recently by having to sleep in the offices of social service departments, in hospital emergency rooms or local hotels as child welfare workers search for a safe bed and temporary housing."

247.     The Director of Wake County's Division of Child Welfare, Paige Rosemond, has been quoted as saying: "We have definitely experienced an increase in not having a placement

and, in turn, having children at our building awaiting placement . . . Up to two children at a time stay at the Wake County Human Services building on a blow-up mattress or a recliner waiting to find a transition home." Rosemond added: "That's what keeps me up at night because I know that these kids' needs are not being met while at our building. Staffers call hundreds of foster facilities across the country for placement, but there simply aren't enough. We have facilities that are just telling us no we can't serve that youth." Children "need the stability. They yearn for it, they're hungry for it . . . If they can get into a home where they feel cared for and safe and like there's no threat that they're going to have to go anywhere again, they bloom . . . I struggle with the fact that we may be, as an individual system and the systems across the state that are serving this shared population, that we are failing these children." Wake County Child Welfare Co-Interim Director, Sheila Donaldson, confirmed that "[t]urning part of an office building into a makeshift shelter for days or even weeks is now a common last resort. On any given night, as many as nine children have slept in the Wake County Social Services Office because of the shortages."

248.   The executive director of a housing service has called the situation "really dire." She explained that "[t]here are not enough places for kids" and that in meetings with DSS leadership, DSS has relayed that there are "kids sleeping in the conference room and that they were having to partner with other organizations for things like showers and meals[.]" The reporter was unable to get answers from the county DSS about why kids are sleeping in buildings, and "[w]hen pressed," a DSS spokesperson would only say that "DSS has nothing further to add and appreciates your efforts to assist in recruiting foster care placements."

249.   North Carolina has known about its placement problems for many years, at least since 2015 when the Child and Family Services Review (CFSR) found that North Carolina's system of foster and adoptive parent licensing, recruitment, and retention was "not in substantial

conformity" with national standards. Among other things, the CFSR noted delays in receiving background check results from DHHS, uncertainty surrounding counties' access to background check information, and the lack of a statewide process to ensure that counties are consistently addressing negative criminal background findings. Additionally, North Carolina "does not have a uniform system in place across the state that monitors or provides consistent standards for diligent recruitment," and "recruitment efforts vary by county and are not coordinated at the state level."

250.    North Carolina's capacity crisis has ballooned over the past decade. In 2012, there were 6,920 non-relative foster homes in North Carolina; in 2022, there were only 5,183. In 2018, there were 6,306 total licensed foster homes; in 2022, only 5,436. Meanwhile, the number of foster children increased from approximately 8,400 in 2012 to 10,200 in 2022. As foster home capacity decreases and the foster care population increases, North Carolina's foster children find themselves in jails, emergency rooms, DSS offices, homeless shelters, hotels, and other inappropriate and unsafe settings.

251.    The Queen City News reported in March 2023 that as North Carolina has suffered a 20% decrease in foster families over the last four years, "foster children have begun to endure more challenging situations, including 'living' out of cots in jails, DSS offices, and emergency rooms because there are not enough foster families in the state to accommodate them." According to the reporting, one hospital group confirmed that more than a dozen children with complex behavioral health needs were living in emergency rooms in one area in North Carolina, and seven other children were similarly situated in the Charlotte-Mecklenburg area.

252.    North Carolina's foster home deficit is contributing to an increased reliance on congregate care. As DHHS recently observed, "data on the use of congregate care suggests North Carolina lacks an adequate supply of family foster homes in at least some counties and regions….

According to their social workers, the most common reason was the lack of an available family foster home." In 2021, North Carolina ranked among the 10 worst states for placing foster children in group homes. The percentage of North Carolina foster children living in congregate care (13%) is nearly double the national average (7%).

253.    The lack of appropriate foster homes in North Carolina has led to a dramatic increase in placement instability. As Secretary Kinsley acknowledged, "among the children who struggle to find an appropriate placement that have been referred to the department for additional help and coordination, a quarter of these children have been moved *fifty times or more*." Between 2017 to 2021, for children in care less than 12 months, the percentage of children with three or more placements increased 10% (from 9% to 19.4%); for children 12-24 months in care, 19% (from 22.8% to 41.7%); for children 24+ months in care, 15% (from 55% to 70.2%). Nearly 1 in 4 foster children in North Carolina have changed placements four or more times. In 2021, North Carolina ranked in the bottom 10 states for placement stability.

254.    Finally, the lack of appropriate foster homes has encouraged a disturbing practice by many County DSS of abandoning foster children in hospital emergency rooms with little agency contact and no educational or mental health services.

255.    According to North Carolina law, "[t]he State recognizes the importance of foster parents in the vital role of supporting children and families experiencing foster care. When children are removed from their parents or legal guardians, families are almost immediately integrated into a team, including child welfare workers, resource parents, a guardian ad litem, attorneys, and others who are working together to address the issues leading to the foster care."  DHHS stated in North Carolina's 2020-2024 Child and Family Services Plan: "Having a sufficient, diverse pool of foster, adoptive, and kinship families will help North Carolina achieve better outcomes for

56

children. Specifically, having a pool of families who are diverse, well-trained, and able to meet the specific needs of children in foster care will provide placement stability; ensure children and youth's well-being needs are met; allow children and youth to remain in their own schools and communities; and provide timely permanency for children and youth who are unable to return home."

256.    A primary contributor to the lack of foster homes is DHHS/DSS's treatment of current and prospective foster parents. Specifically, the culture of fear and retribution in North Carolina deters foster parents from seeking and maintaining a license. Upon information and belief, county DSS routinely retaliate against foster parents for voicing opinions or opposing DSS recommendations by removing or threatening to remove their foster children, and by substantiating or threatening to substantiate allegations of abuse and neglect against them. Instead of being treated as critical members of the child welfare team, foster parents who request services for their foster children are often told that they "can't take care of the child," that they "are giving up on the child," or that they are "getting too close to the child." North Carolina's treatment of foster parents causes foster parents to stop accepting placements, discourages foster parents from renewing their licenses, and deters prospective foster parents from seeking a license.

257.    Adding to the recruitment and retention problem, foster parents have little to no recourse against these practices. The North Carolina Foster Parents' Bill of Rights is an aspirational statement, not an enforceable contract. If DSS violate these rights, foster parents have no recourse.

258.    Lacking appropriate foster homes, North Carolina has increasingly relied upon group homes for placement. Sometimes referred to as "foster communities" or "campus-based foster care," these placements house children in "cottages," each staffed by "professional parents."

These "professional parents" live in the foster community and rotate in and out on a weekly basis. North Carolina's reliance upon foster communities places children at serious risk of harm. First, upon information and belief, North Carolina counts a foster community as one placement even though children are frequently transferred between cottage homes and "parents" within the community. Studies suggest that "every move counts," and North Carolina's failure to account for these intra-community moves and professional foster parent rotations obscures the scope of North Carolina's placement instability problems. Second, upon information and belief, the "professional parent" model is incompatible with evidence-based treatments like Trauma-Based Cognitive Behavioral Therapy (TB-CBT) because TB-CBT requires a consistent caregiver. Additionally, the insular nature of these communities restricts children's access to health services outside the community, and health professionals have significant difficultly providing services to children living inside the community. Finally, foster care communities contribute to a lack of permanency because the children are not placed with people who, for the most part, will be interested in adopting them if they cannot be reunited with their parents, or are otherwise committed to their well-being.

259. North Carolina knows or should know that its policies, practices, and customs contribute to a decline in foster parent recruitment and retention, and that the failure to maintain a sufficient number of appropriate homes places foster children at serious risk of irreparable harm. Indeed, DHHS keeps an ongoing tally of children placed in inappropriate crisis settings. As DHHS acknowledged: "inappropriate settings compounds the trauma that children experienced during separation from their families and natural support systems. The longer children are separated from their families, the less likely they are to be reunified with them, and they run a higher risk of

experiencing poor health and social outcomes, including homelessness and involvement with the justice system."

## II.    Defendants' Policies and Practices Cause Crushing Caseloads and Caseworker Turnover

260.    Qualified caseworkers are vital to the administration of every child welfare system. They are responsible for ensuring the safety, permanency, and well-being of children who are at risk of abuse, neglect, or exploitation. To carry out this critical task, they must assess the needs of each child and family, develop individualized plans to meet those needs, and monitor progress toward achieving the desired outcomes.

261.    When caseworkers have manageable caseloads, they can provide comprehensive and individualized services to each child and family in their care. They can take the time to build rapport, engage in meaningful conversations, and identify the unique needs and strengths of each child and family. They can work collaboratively with other professionals and community resources to address complex issues and provide timely interventions. As a result, they can help ensure that children are safe, supported, and able to thrive in their families and communities.

262.    For this to happen, the Child Welfare League of America ("CWLA"), a national coalition of agencies that develops child welfare policies, has recommended that caseloads be between 12 and 15 children per worker for children in foster care. The Council on Accreditation ("COA"), a national professional licensing organization, has recommended that caseloads be 12 to 15 children per worker and only eight children where the child is in treatment foster care.

263.    North Carolina has set its own standards, in 10A NCAC 70G.0501, at 15 children for children placed in foster family homes and at 12 children for children placed in therapeutic foster homes. The counties regularly ignore and fail to maintain these standards. And DHHS does not take steps to determine whether these standards are complied with.

264.    When caseloads exceed these standards, caseworkers are unable to devote the necessary time and attention to each child in their care. Additionally, overburdened workers often experience burnout and high levels of stress, leading to turnover and a shortage of experienced workers. High turnover increases caseload burdens on remaining caseworkers, reduces productivity and morale, increases feelings of hopelessness and frustration, and this caustic workplace fuels the vicious turnover cycle. This combination of unmanageable caseloads and high caseworker turnover creates a "cycle of crisis" that allows children to fall through the cracks.

265.    Unmanageable caseloads feed caseworker turnover, which commonly results in delayed permanency for foster children. One study found that foster children with one caseworker in a given year had an approximately 75% chance of achieving permanency, those with two caseworkers had an approximately 18% chance of permanency, and those with more than three caseworkers had only a 2% chance of permanency. In addition, caseworker turnover is high, with average statewide turnover at 27%; one-in-four counties has a turnover rate higher than 40%.

266.    North Carolina has been stuck in this cycle of crisis caused by crushing caseloads and chronic turnover. A 2016 report by the Public Consulting Group found that only half of CPS and in-home social workers were within the state's recommended caseload size according to "self-reported" case load sizes. Staff reported that "the stress of child protection and the secondary trauma and burnout of CPS leads to greater turnover, which may be an underappreciated cause by leadership." When caseworkers quit, "counties must scramble to fill their position and in the meantime, the responsibilities for the cases are assumed by other social workers with full caseloads themselves."

267.    Several years later, DHHS noted in its 2020-2024 Child and Family Services Plan that "Child welfare staff feel overwhelmed, unable to complete the work they are assigned, and

struggling to manage a work-life balance." A "common theme" replayed by stakeholders was that "staff turnover is a major issue. County DSS staff need more training and support to mitigate this critical issue." Additionally, "barriers to implementation [of certain reforms] include current caseloads of foster care staff which exceed the standard youth to staff ratio."

268.    According to North Carolina's 2022 Annual Progress and Services Report, "[r]ecent feedback from local child welfare agencies indicates that the increased workload on child welfare workers has led to worker turnover and burnout." From 2020 to 2022, turnover rates increased from 23% to 34%, and vacancy rates increased from 13% to 23%.

269.    DHHS does not verify self-reported compliance with caseload standards, nor has it established any mandatory performance metrics related to caseload standards. DHHS guidance provides that "CPS Intake shall be no greater than one worker per 100 CPS referrals a month; CPS Assessments shall be no greater than 10 families at any time per worker; CPS In-Home Services shall be no greater than 10 families at any time per worker." Compliance with caseloads standards is evaluated through quarterly self-reports from county DSS and semi-annual reviews; however, DHHS admits that the data "is not fully vetted and verified."

270.    DHHS has not "establish[ed] a universal definition for caseload across child welfare," despite the state law requirement setting of caseload standards by child for children in custody.  North Carolina's 100 counties apply different processes to calculating caseload sizes and define "caseload" in different ways, and there is no system for weighting blended caseloads and responsibilities. Without an accurate understanding of actual caseloads across the state, and how many children workers are responsible for, DHHS is incapable of addressing the caseload-turnover cycle of crisis.

61

271.    DHHS has received numerous warnings that its failure to address the caseload and turnover issues threaten the safety and wellbeing of foster children. The North Carolina Office of State Personnel reported in 2004 that "the turnover and retention problems have become so acute as to seriously compromise the safety and well being of the most vulnerable children." The 2015 CFSR flagged concerns related to caseloads and workloads. An independent audit by Public Consulting Group in 2016 notified DHHS that "[l]arge caseloads and excessive workloads make it difficult for CPS social workers to serve families effectively and can contribute to burnout and turnover" while "[m]anageable caseloads and workloads can make a real difference in a social worker's ability to spend adequate time with children and families, improve staff retention, and ultimately have a positive impact on outcomes for children and families." The report warned that "[t]he lack of a consistent statewide definition of 'caseload' makes it difficult" to calculate caseload sizes reported by county DSS. A subsequent audit by the Center for the Support of Families reprised these concerns, noting that "it is not possible for caseworkers with caseloads at the current standards to meet the current expectations for their positions." And most recently, DHHS was warned that "[i]ncreased workloads leave staff with less time to establish relationships with children and families, conduct frequent and meaningful home visits, and make thoughtful and well-supported decisions regarding safe and stable placements."

272.    Despite these warnings, DHHS has failed take meaningful steps to address the issue. DHHS committed to completing a caseload and workload study by September 2021, but DHHS never did, causing the North Carolina Association of County Departments of Social Services to ask in a January 23, 2023 meeting "are we ever going to re-evaluate case load standards?"

273.     Given the issues with caseloads and turnover, North Carolina has also faced ongoing issues in caseworker training. The 2015 CFSR noted significant issues in initial and ongoing staff training, which contributes to additional turnover. North Carolina received a rating of "Area Needing Improvement" for initial staff training, noting that "demand for and locations of the trainings created barriers to attendance resulting in delayed start dates for some new employees." Moreover, "the initial training does not fully prepare staff because it does not provide them with the basic skills necessary to do their work," and it is not clear that caseworkers are even engaging in the training because "the state does not have a good system for tracking staff participation in online training."

274.     The Public Consulting Group Report noted that "34 percent of frontline social workers reported that trainings are often too full to register," "54 percent of frontline social workers reported that training locations were inconvenient," and "65 percent of frontline social workers reported that they are too busy with cases to attend trainings." Moreover, supervisors and DSS county leadership reported that the training that new employees were able to attend was "not adequately preparing new social workers for the challenges of CPS." Specifically, in a statewide survey, "53 percent of leadership surveyed reported that pre-service did not prepare social workers for CPS" and that the "pre-service training is structured as an introduction to child welfare, but does not provide knowledge on how to do CPS work."

275.     North Carolina's crushing caseloads and chronic turnover has forced the state to rely on untrained and unqualified caseworkers. When hiring caseworkers, county DSS submit applications to the North Carolina Office of State Human Resources. When counties are unable to find qualified candidates, state regulations permit counties to hire unqualified employees in a "work-against" status, "allowing the employee to gain the qualifications needed for the full class

through on-the-job experience." No state agency has the power to enforce these rules. The PCG report showed that "smaller, more rural . . . counties have to make tradeoffs to hire social workers who are not fully qualified." Indeed, the average of qualified hires in any set of counties was at most still less than 60%.

276.     Issues with recruitment and retention have been noted in North Carolina media. For example, the DSS Director for Lenoir County warned of a "recruitment and retention pandemic, across the board." In 2021, Lenoir County has a turnover rate of 61%. According to this DSS Director, when turnover is that high it means supervisors have to carry a caseload or social workers work more than 40 hours a week. Of the 23 social workers hired in Lenoir County, 16 were on work-against status, meaning that applicants did not meet minimum standards set forth in state law for the positions. The Director noted a marked increase in the numbers of work-against hires in the past two years.

277.     Numerous reports and audits—including some commissioned by DHHS itself—have informed the agency that caseloads are too high and that, as a result, children are at a greater risk of harm. The findings and recommendations have been replicated repeatedly over the past two decades. Every report identifies unmanageably high caseloads as one of the most urgent problems faced by the state and explicitly warns that high caseloads compromise caseworkers' ability to keep children safe. DHHS has failed to take meaningful steps to address the problem and appears no closer to escaping the cycle of crisis.

## III.     Defendants' Policies and Practices Cause Children to Languish in Foster Care

278.     The primary goal of foster care is to provide a temporary, safe, and supportive environment for children while their parents work towards resolving the issues that led to their removal or, if that is not practicable, that another permanent placement be found for the child. Agencies must provide services and support to parents to address the challenges they face, with

the ultimate aim of reunifying the child with their biological family when it is deemed safe and in the child's best interest. Alternatively, when children cannot be safely reunified with their parents, agencies must move expediently to ensure that children achieve permanency through adoption.

279.     States must act swiftly to secure permanency for children because extended stays in foster care can disrupt a child's sense of belonging and hinder their emotional, educational, and social development.

280.     Data illustrates that North Carolina foster children are languishing in state custody. Reentry rates in North Carolina dramatically increased from 2017 to 2021: 277% increase in children reentering care within 12 months of a prior episode (from 2.2% to 8.3%); 427% increase in children reentering care more than 12 months after a prior episode (from 1.1% to 5.8%).

281.     North Carolina consistently ranks among the worst 10 states for reunification (45.6% in 2021) and among the top 4 states for guardianship (22.4% in 2021). Upon information and belief, county DSS routinely recommend that pre-adoptive foster parents accept guardianship of foster children, sometimes threatening removal if the foster parents do not. This saves DSS the time and expense of going through the TPR process. But it denies the child real permanency and denies guardians the financial assistance that comes with adoption.

## IV.     Defendants Fail to Develop and Update Comprehensive Case Plans for Children and Families

282.     DHHS and DSS are required under federal law to provide children in foster care with a case plan that is reviewed regularly—at least once every six months—until a child's case is resolved and the child leaves DHHS/DSS custody. These case plans focus on ways to resolve the case and support the foster child, including plans to effectively engage family members and services to address the family's and the child's needs.

283.     DHHS fails to provide specific and updated case plans to children, instead resorting to "cookie cutter" case plans that are not regularly reviewed. Without effective case plans, foster children and their families go without the necessary services and support they require.

284.     North Carolina has long known that it fails to provide timely and effective case plans, starting in 2015 when the CFSR found that North Carolina was not in substantial conformity with the case review system, including Item 20 (written case plans), which was rated as an Area Needing Improvement. This was because "[i]nformation in the statewide assessment and confirmed during stakeholder interviews indicated that the state has no ability to monitor the functioning of this systemic factor item and that families are not consistently engaged in case planning, especially non-custodial parents. Stakeholders expressed concern that parents were not provided timely notification of case planning meetings and that diligent efforts to locate and serve notice of the proceedings to non-custodial parents were not made. Stakeholders indicated that the plans are not reflective of the needs of the child and family."

285.     The CFSR also found that the agency made concerted efforts to involve children in case planning on only 60% of cases reviewed, the agency made concerted efforts to involve mothers in case planning in only 67% of the cases reviewed and made concerted efforts to involve fathers in case planning in only 48% of the cases reviewed. The lack of involvement of families and children in case planning also leads to additional permanency issues and failures to obtain the supportive services that foster children require.

286.     Similarly, a 2018 report by the Center of Support of Families, which was hired by North Carolina to review its child welfare system, found that "[c]hildren and parents are not consistently engaged in the development of case plans." Only 56% of foster cases reviewed rated as a strength for child and family engagement, and data suggested similar trends in engaging

parents in case planning activities. Only 45% of counties held initial Child and Family Team Meetings ("CFTs"), and only 39% held ongoing CFTs.

287.     There is also little re-evaluation of case plans throughout the life of the case, which impacts reunification and permanency efforts. For example, the Center of Support of Families report found that Family Reunification Assessments were only being completed, reviewed and updated approximately 50 percent of the time and that Family Services Agreements were not being consistently reviewed and formally updated with parents. The report also noted that "the lack of consistent quality face-to-face contact between workers and parents can also pose a barrier to establishing relationships that help facilitate meaningful conversations with mothers and fathers around their changing needs and progress being made towards having their children returned to them."

288.     The lack of involvement of families in case planning and the lack of comprehensive, individualized, and updated assessments ensures that families and foster children are set up to fail. Case planning issues lead to longer times to permanency, to failures in reunification where reunification is possible, and to further emotional and physical harm to foster children. North Carolina has known about case planning issues for nearly a decade but has failed to adequately address them.

## V.     DHHS's Failure to Establish a Reliable Information System Creates a Fragmented Information Landscape And Places Foster Children at Risk of Serious Harm

289.     Reliable information is a minimal requirement for all foster care systems. Reliable information in turn has certain minimal requirements: that it be full, complete, and comprehensive; that it be accurate; and that it be available, usable, and readily accessible so that it can be relied upon.

290.     Without a reliable information system, caseworkers are unable to perform critical tasks necessary to ensure the safety and well-being of foster children.

291.     After nearly a decade ignoring warnings and abdicating its leadership responsibilities, DHHS has failed to establish a reliable case management system necessary to track the status and needs of children in foster care.

292.     North Carolina's 2015 CFSR revealed a defunct information system. Following the CFSR, the Administration on Children, Youth and Families (ACYF) placed DHHS on a three-year Performance Improvement Plan (PIP), which set a goal for DHHS to "[e]nhance the statewide data quality, collection and dissemination of information regarding services provided."

293.     In response, DHHS began development on a child welfare component of NC FAST, DHHS's management software, called Program 4 (P4). But the development and rollout of P4 has proved disastrous.

294.     The Social Services Regional Supervision and Collaboration Working Group and the North Carolina Association of County Directors of Social Services both recommended that North Carolina reexamine plans to use P4 for child welfare case management. But DHHS ignored these concerns and continued the rollout.

295.     When issues persisted and counties protested, the General Assembly postponed implementation of P4 and allowed counties to opt out. Of the 57 counties expected to adopt P4, more than 40 counties opted out. As of 2020, "25 counties [were] using NC FAST for Intake and Assessment and [only] 11 pilot counties [were] using NC FAST for additional services such as In-Home Services and Permanency Planning." That means 64 counties were not using NC FAST at all and were instead resorting to legacy computer systems and paper-based systems. In this

fragmented landscape, data is often lost as children are moved between homes and institutions in different counties.

296.    DHHS's failure to develop and implement a comprehensive electronic record and case management system means that the case management problems identified over a decade ago persist today. Indeed, DHHS's failures have exacerbated case management problems. Some counties "are already exploring P4 alternatives including paper-based systems," and others "are preparing to invest county funds to supplement their legacy systems with software that only supports limited aspects of child welfare case management."

297.    North Carolina Senator Carl Ford expressed frustration after waiting more than a decade and spending tens of millions of dollars of taxpayer money on NC FAST, saying "We jokingly call it NC Slow because it's terrible . . .  It takes up too much time. And it just doesn't work, and we've wasted millions of dollars on it.'" North Carolina Senator Joyce Kraweic, chairwoman of the Senate Committee on Appropriations on Health and Human Services, similarly expressed frustration that "FedEx can track a package and tell you where it is every step of the way, and all about it . . . We can't keep up with our children and where they are in NC Fast. And there's no excuse for it."

298.    DHHS's failures place North Carolina's federal funding in jeopardy, turning an already perilous financial situation into a catastrophe. NC FAST was supposed to address these data collection, entry, and reporting problems, but DHHS's development and implementation of P4 has caused even greater fragmentation.

299.    And DHHS knows or should know that its failure to secure and retain federal funding via compliance with federal law exacerbates financial problems and places children at significant risk of serious and irreparable harm.

**VI.** **DHHS Failure to Monitor and Supervise Licensed Facilities Places Foster Children at Risk of Harm**

300.    DHHS is responsible for monitoring licensed homes and facilities. State law grants DHHS the power and responsibility to periodically review licensees to determine compliance with the rules (§ 131D-10.3); to collect data on the use of restraints in residential child-care facilities (§ 131D-10.5A); to conduct criminal background checks and determine if caretakers are fit to care for foster children (§ 131D-10.3A); and to exercise its powers to protect the health and safety of children in facilities (§ 131D-10.6).

301.    DHHS's Division of Social Services (NC DSS) is responsible for overseeing foster homes (G.S. 131D-10.2(8); NCAC 70E) and residential child-care facilities (G.S. 131D-10.2(8); NCAC 70I). DHHS's Division of Health Services Regulation (DHSR) is responsible for overseeing residential treatment facilities (G.S. 122C-3(14); NCAC 27G.1300; NCAC 27G.1700; NCAC 27G.1800; NCAC 27G.1900).

302.    The North Carolina Administrative Code (NCAC) requires DHSR to revoke a license whenever it finds: there has been failure to comply with G.S. 122C; there has been failure to comply with rules promulgated under G.S. 122C; and such failure to comply endangers the health, safety or welfare of the individuals in the facility (NCAC 27G .0405(d)).

303.    Despite these powers and duties, DHHS does not regularly inspect licensed facilities, or otherwise maintain any meaningful oversight of its licensees.

304.    DHHS routinely fails to take any meaningful action when safety violations are uncovered. It issues citations, but almost never fines or suspensions.

305.    Unlike NC DSS, DHSR publishes its inspection reports. The DHSR reports ("Statements of Deficiencies") from 2018-2023 covering 205 facilities licensed by DHSR under NCAC 27G.1300, .1700, and .1800 reveal serious and chronic safety problems.

306.     Of the 205 facilities reviewed, 57% (106) were cited for medical requirements violations. Some facilities were cited multiple times, year after year. For example, Pearl's Angel Care, Inc., a residential treatment facility in Cumberland County, was cited for violations of medication requirements every year from 2019-2022. Children on psychotropic medications are being underdosed and overdosed, they are not provided their medication at the prescribed intervals, some do not receive their medication at all, others receive medication that a doctor has not prescribed. Medications are stored improperly, and medical records are often pre-filled, incorrect, or left blank entirely. Medication issues are not properly reported to the child's doctor, and the individuals administering the medication lack the qualifications to administer such medication.

307.     Of the 205 facilities reviewed, 40% (82) were cited for violations of minimum staffing requirements. In these understaffed facilities, children are left unsupervised and are placed at significant risk of harm.

308.     Despite these facilities' numerous and repeated violations of the NCAC, DHSR fails to take any meaningful enforcement action against them. Of the 205 facilities reviewed, less than 1% received "penalties or serious administrative actions against their license."

309.     At most, the facilities are required to submit to a corrective action plan that contains no accountability measures. Due to the lack of any meaningful accountability, these facilities often continue to repeat these violations year after year.

310.     DHSR's lack of enforcement seriously endangers the health, safety, and welfare of the children in these facilities. Moreover, DHHS's knee-jerk response to news reports—that County DSS, not DHHS, are responsible—reveals that DHHS has made a deliberate choice not to conduct ongoing oversight based on its legally erroneous position that County DSS are responsible

for monitoring licensed facilities. DHHS is fully aware that its failure to monitor licensees with long histories of noncompliance places foster children at serious risk of significant harm.

**VII.    DHHS's Non-Enforcement Policy Places Foster Children at Significant Risk of Harm**

311.    The core responsibility of supervisory agencies is to establish performance requirements, monitor compliance with the requirements, and enforce the requirements. North Carolina law requires DHHS to establish and implement mandatory performance requirements for county DSS child welfare services, and to develop and implement corrective action plans when county DSS do not meet those requirements. G.S. § 108A-74(a2), (a3), (c), (j).

312.    However, DHHS has established only one statewide mandatory performance requirement for county DSS child welfare services: that 95% of all foster youth have a face-to-face visit with the social worker each month, which is also a federal requirement which the agency is responsible for reporting on. DHHS has not established any additional mandatory performance requirements.

313.    Even if DHHS developed meaningful performance requirements, those requirements would go unenforced because DHHS has adopted a formal policy abandoning the use of the statutorily mandated corrective action policy. In its 2021 Oversight Report to the Joint Legislative Oversight Committee on Health and Human Services, DHHS announced that "[a]s part of encouraging capacity-building, DHHS will no longer enforce 'corrective action' upon counties. It will instead focus on encouraging county-level 'development plans' that analyze and solve problems through deliberate use of evidence." DHHS reaffirmed this policy in its 2023 Oversight Report.

314.    Instead of establishing meaningful performance requirements and taking corrective actions, DHHS has adopted a custom and practice of assuming direct control over child welfare services only after the substantial risk of harm has escalated to actual irreparable harm.

315.    For example, in May 2022, DHHS assumed direct responsibility for Bertie DSS child welfare services based on "systematic lack of adequate training, supervision, and capacity to deliver appropriate child welfare services in accordance with law, rule, and policy," and deficiencies that posed "a substantial threat to children's safety and welfare in Bertie County." This was after a DHHS review only five months earlier purportedly concluded that Bertie DSS was adequately administering the child welfare system.

316.    No child welfare staff, including the supervisor and director, had completed the training required for their roles. Staff were unable to "describe how the concepts of safety, well-being, and permanence are integrated from the point of Intake to Adoption," "articulate the basics of child welfare practice," or "describe a rationale for their decision making." There was also "a complete absence of leadership over child welfare services." Additionally, documentation in all records was "minimal to non-existent," case decisions were not supported by information or documentation, and case decisions were made without guidance or input from a supervisor.

317.    The Bertie DSS hotline was essentially nonfunctional. Bertie DSS did not have an intake schedule to ensure that calls were taken, and one community member reported that "they had tried calling in a report every day for a week with no response." Staff did not log intake reports, did not track screening decisions, and did not record and maintain screened-out reports. "Most intakes were missing crucial information, screening tools were not complete, timeframes were not assigned to all cases, and most intakes did not have the required two-level screening."

318.    DHHS's inability to identify these obvious and systemic deficiencies in the years and months preceding its assumption of control over Bertie county reflects systemic disfunction in its supervision and monitoring of county DSS.

319.    A supervisory agency that waits for tragedy to strike before intervening is not performing its most basic responsibility. DHHS's failure to fulfill its supervisory role threatens the safety and wellbeing of North Carolina's foster children. DHHS officials were aware of these problems and the risks they posed to foster children. DHHS's decisions to forgo mandatory performance metrics and corrective action plans delayed intervention until after children suffered serious irreparable harm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Substantive Due Process under the U.S. Constitution**
**(Asserted by the General Class Against Defendants)**

320.    Each of the foregoing allegations is incorporated as if fully set forth herein.

321.    A state assumes an affirmative duty under the Fourteenth Amendment to the U.S. Constitution to provide reasonable care to, and to protect from harm, a child with whom it has formed a special relationship.

322.    The foregoing actions, inactions, and omissions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment, is objectively unreasonable under the facts and circumstances, and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the General Class. Defendants are well aware and should have been aware of the policies and practices in place, which prevent these class members from receiving adequate protection from physical and psychological harm after the State has formed a special relationship with them. As a result, the named Plaintiffs and all of the members of the class of children to whom the state owes a special duty, children who have a special relationship with Defendants, including wards of DHHS, have been, and are, at risk of being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the U.S. Constitution.

323. These substantive due process rights include, but are not limited to:

   a. the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State;

   b. the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child;

   c. the right to services necessary to prevent unreasonable risk of harm;

   d. the right to conditions and duration of foster care reasonably related to the purpose of government custody;

   e. the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody;

   f. the right to treatment and care consistent with the purpose and assumptions of government custody;

**SECOND CAUSE OF ACTION**
**First, Ninth and Fourteenth Amendments to the U.S. Constitution**
**(Asserted by the General Class Against Defendants)**

324. Each of the foregoing allegations is incorporated as if fully set forth herein.

325. Plaintiffs and the class members they represent are in Defendants' custody or guardianship and are wholly dependent on Defendants to provide for their basic physical, psychological, and emotional needs, and to protect them from physical, psychological, and emotional harm.

326. Children frequently and foreseeably suffer physical, psychological, and emotional harm in DCS custody. They suffer harm in part because, in sharp contrast with the ideal of a stable and permanent home and family, they are continually shuttled between temporary and often non-familial custodial arrangements. Professional judgment and standards of conduct require the

Defendants to make reasonable efforts toward placing children in their care in stable, permanent homes and families.

327.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference to the constitutional rights of Plaintiffs and the members of the General Class.

328.    By failing to take all reasonable efforts toward fostering familial association and securing a permanent home and family for the named Plaintiffs and the class members they represent, Defendants have failed to protect them from psychologically and emotionally harmful shuttling between temporary living arrangements.

329.    As a result, the named Plaintiffs and all of the members of the General Class have been, and are at risk of being, deprived of the right to familial association and reasonable protection from psychological and emotional harm while in Defendants' custody, in violation of the First Amendment's right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections.

## THIRD CAUSE OF ACTION
### The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq.
### (Asserted by the General Class Against Defendants)

330.    Each of the foregoing allegations is incorporated as if fully set forth herein.

331.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the rights contained in the Child Welfare Act of 1980, as amended by the Adoptive and Safe Families Act of 1997, to:

a. a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home community, 42 U.S.C. §§ 671(a)(16), 675(5)(A), and;

b. a case review system in which the status of the child is reviewed no less frequently than every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, continuing necessity and appropriateness of the placement, extent of compliance with their permanency plan and projected date of permanency, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C).

c. a written case plan that contains the health records of the child, including the child's known medical problems, the child's medications, and other relevant health information concerning the child, 42 U.S.C. §§ 671(a)(16), 675(1)(C)(v)-(vii).

d. a procedure for assuring that a child's health record is reviewed and updated, and that a child's updated health record is provided to the foster parent or foster care provider at the time of placement, 42 U.S.C. §§ 671(a)(16), 675(5)(D).

e. In the case of a child with respect to whom the permanency plan is placement with a relative, a description of the steps the agency has taken to determine that it is not appropriate for the child to be returned home or adopted, the reasons for any separation of siblings, and the reasons why a permanent placement with the relative is in the child's best interests. 42 U.S.C. § 675(1)(F).

f. A plan for ensuring the educational stability of the child while in foster care. 42 U.S.C. § 675(1)(G).

g. For each child in foster care for 15 of the most recent 22 months, DSS (i) petition to terminate the parental rights of the child's parents, subject to statutory

exceptions; and (ii) concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child. 42 U.S.C. § 675(5)(E).

332.    These provisions of the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, are clearly intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous such to strain judicial competence; and the statute imposes a binding obligation on the states. 42 U.S.C. § 1983.

333.    Defendants have been aware, should have been aware, are aware, and should be aware of all of the deprivations complained of herein, and Defendants have been deliberately indifferent to such conduct, failing to take steps to abate the risk of harm as a reasonable official would.

### FOURTH CAUSE OF ACTION
**Americans with Disabilities Act and Rehabilitation Act**
**(Asserted by the ADA Subclass Against Defendants)**

334.    Each of the foregoing allegations is incorporated as if fully set forth herein.

335.    Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 et seq., prohibit discrimination against individuals with disabilities.

336.    ADA Subclass Plaintiffs have behavioral, developmental and psychiatric disabilities, which qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12132(2) and "otherwise qualified individuals with a disability" under the Rehabilitation Act, 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DHHS.

337.     Defendants are public entities, or public officials of a public entity, subject to the provisions of the ADA, 42 U.S.C. § 12132(1)(A). Such entities also receive federal financial assistance and are thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. § 794(b); 34 C.F.R. 104.51. Defendant Kody Kinsley is sued in his official capacities as the state official responsible for supervising North Carolina programs and activities related to foster care services.

338.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of his or her disability.

339.     Likewise, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. 34 C.F.R. 104.4(b)(1)(ii), (b)(2); 34 C.F.R. 104.52(a)(2).

340.     Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

341.     Accordingly, DHHS must provide children with disabilities an equal opportunity to access foster care services, in the least restrictive appropriate setting, as it provides to children without disabilities in its custody.

342.     Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications

would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

343.    As set forth above, the regulatory hallmark and guiding force of disability law is the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs. 28 C.F.R. § 35.130(d); 34 C.F.R. 104.4(b)(2); *see also Olmstead v. L.C.*, 527 U.S. 581, 602 (1999).

344.    As a direct and proximate result of Defendants' violations of Title II of the ADA and the Rehabilitation Act, Plaintiffs have been or are at risk of being placed in overly restrictive settings and subjected to unnecessary trauma because of their disabilities, as set forth above, and will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the ADA and Rehabilitation Act.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983 Against County Defendants**
**(*Monell v. Dep't of Social Services*, 436 U.S. 658)**

345.    Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

**Mecklenburg County and Mecklenburg DSS-YFS**

346.    The Mecklenburg County Board of Commissioners created a Consolidated Health and Human Services Agency (Mecklenburg HHS). Mecklenburg County Department of Social Services-Youth and Family Services (Mecklenburg DSS-YFS) is a department under Mecklenburg HHS. The Board of Commissioners exercises oversight over all county programs and departments.

347.    The Director of Mecklenburg DSS-YFS is the final policymaker for all policies and procedures established to govern the operations and activities of Mecklenburg DSS-YFS.

348.    Kim Henderson is the current Director of Mecklenburg DSS.

349.    Mecklenburg County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

350.    Mecklenburg County maintains a policy, custom, or pattern of practice of transporting foster children to hospital emergency departments for mental health treatment and letting those children languish at the hospital for days and weeks beyond medical necessity because DSS is unable or unwilling to find an appropriate placement for the child.  Often, these emergency departments are located in hospitals that are not equipped to address mental health needs or provide adequate pediatric care.  Hospital staff cannot adequately supervise these children or prevent them from running away.

351.    During these hospital stays, children often do not receive required educational or social services.

352.    As a result of Mecklenburg DSS' failure to provide necessary medical and education services to children held in hospitals, the plaintiffs' mental and physical health deteriorates, and their chances of placement stability and permanency diminish.

353.    This policy, custom, or pattern of practice violates N.C. Gen. Stat. § 122C-142.2.

354.    Mecklenburg County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, one

in three children in the custody of Mecklenburg DSS had four or more placements. For children ages 6-12, 37% had four or more placements; and for children ages 13-17, 58% had four or more placements.

355.     Mecklenburg County also ranks among the worst jurisdictions (nationally and statewide) for permanency outcomes. The national average for children discharged to permanency within 12 months of entering care is 41%, and the state average is 28%. Between July 1, 2023 and June 30, 2024, Mecklenburg County averaged 26% permanency within 12 months.

356.     The vicious cycle of placement instability and delayed permanency compromises the health and safety of children in the custody of Mecklenburg DSS.

357.     At the root of these placement and permanency problems are a severe lack of staff and resources. In fiscal year 2023, Mecklenburg DSS-YFS "experienced significant staff turnover…" And in fiscal year 2023, "experienced a decrease in placement resources for children in YFS custody, which has resulted in children remaining overnight in the DSS office, a hotel, or partner facility." "Since July 2022, an average of 6 children per month have experienced an overnight stay in an unlicensed arrangement. Some children stay for as little as one to two nights, and other have stayed several weeks." "YFS needs increased capacity for licensed foster homes and emergency placements."

**Gaston County and Gaston DSS**

358.     The Gaston County Board of Commissioners is charged with providing policy direction for the administration of county government and providing for the efficient operation of government services.

359.     Gaston County Board of Commissioners created a Consolidated Health and Human Services Agency (Gaston DHHS). Gaston County Department of Social Services (Gaston DSS) is

a department under Gaston DHHS. The Board of Commissioners exercises oversight over all county programs and departments.

360. The Director of Gaston DSS is the final policymaker for all policies and procedures established to govern the operations and activities of Gaston DSS.

361. Angela Karchmer is the current Director of Gaston DSS.

362. Gaston County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

363. As of May 2022, Gaston County had about 400 children in foster care and only 50 licensed foster homes. Consequently, foster children are housed in DSS offices, placed out-of-county, and shuffled between various placements.

364. Gaston County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 42% of children in the custody of Gaston DSS had four or more placements. For children ages 6-12, 52% had four or more placements; and for children ages 13-17, 57% had four or more placements.

365. Gaston County also ranks among the worst jurisdictions (nationally and statewide) for permanency outcomes. The national average for children discharged to permanency within 12 months of entering care is 41%, and the state average is 28%. Between July 1, 2023 and June 30, 2024, Gaston County averaged 21% permanency within 12 months.

366. The vicious cycle of placement instability and delayed permanency compromises the health and safety of children in the custody of Gaston DSS in violation of plaintiffs' federal rights.

### Johnston County and Johnston DSS

367. The Johnston County Board of Commissioners is charged with providing policy direction for the administration of county government and providing for the efficient operation of government services. The Board of Commissioners exercises oversight over all county programs and departments.

368. Johnston County Department of Social Services (Johnston DSS) is a department under the Johnston County Board of Commissioners.

369. The Director of Johnston DSS is the final policymaker for all policies and procedures established to govern the operations and activities of Johnston DSS.

370. Christine Dowdell is the current Director of Johnston DSS.

371. Johnston County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

372. Johnston County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 24% of children in the custody of Johnston DSS had four or more placements. For children ages 6-12, 34% had four or more placements.

373.    Johnston County also ranks among the worst jurisdictions (nationally and statewide) for rates of reentry. The national average for children reentering foster care within 12 months of discharge is 8%, and the state average is 4%. Between July 1, 2023 and June 30, 2024, Johnston County averaged 18% reentry to foster care within 12 months.

374.    The vicious cycle of placement instability and impermanence compromises the health and safety of children in the custody of Johnston DSS in violation of plaintiffs' federal rights.

375.    At the root of these placement and permanency problems are a severe lack of foster homes and staff. The Johnstonian News reported in July 2024 that Johnston County has over 300 foster children, about 30 foster homes, and of those 30, only 8 with open beds. Consequently, many foster children in Johnston County are forced to sleep in DSS offices, a problem that has become so pervasive that local organizations have attempted to fill the gap. When asked to comment on the sexual assault of a child staying in a DSS office, former interim Director of Johnston DSS, Ben Rose, described vacancies as high and turnover as constant. The combination of unmanageable caseloads and turnover creates a cycle of crisis where children in Johnston County fall through the cracks.

**Harnett County and Harnett DSS**

376.    The Harnett County Board of Commissioners is charged with providing policy direction for the administration of county government and providing for the efficient operation of government services. The Board of Commissioners exercises oversight over all county programs and departments.

377.     Harnett County Department of Social Services (Harnett DSS) is a department under the Harnett County Board of Commissioners charged with administering the county's foster care system.

378.     The Director of Harnett DSS is the final policymaker for all policies and procedures established to govern the operations and activities of Harnett DSS.

379.     Paul Polinski is the current Director of Harnett DSS.

380.     Harnett County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

381.     Harnett County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 21% of children in the custody of Harnett DSS had four or more placements.

382.     Harnett County also ranks among the worst jurisdictions (nationally and statewide) for permanency outcomes. The national average for children discharged to permanency within 12 months of entering care is 41%, and the state average is 28%. Between FY2022-2023, Harnett County averaged 11% permanency within 12 months. The median time a child spends in the custody of Harnett DSS is 593 days, over 100 more days than the state average.

383.     The vicious cycle of placement instability and delayed permanency compromises the health and safety of children in the custody of Harnett DSS in violation of plaintiffs' federal rights.

384.     At the root of these placement and permanency problems are a severe lack of staff

and resources. Harnett County's FY2022-2023 Approved Budget "Additional staff would ensure

a more proportionate distribution of caseloads to staff. This would decrease safety risks to children

in the community and would greatly improve worker morale. CPS has a high turnover rate due to

the demands of the job to include higher than recommended caseload sizes." Harnett County's

FY2023-2024 Approved Budget calls for hiring additional DSS supervisors "due to the increase

in caseloads, complexity of cases and multiple new standards and requirements. The State

recommends one supervisor for five social workers. Harnett County currently has one supervisor

for seven social workers. The number of children in foster care continues to increase. The lack of

adequate supervisors could lead to standards being missed and the possibility that families and

children are not receiving adequate services." "DSS currently has seven vehicles that are shared

among 45 social workers."

### Davidson County and Davidson County DSS

385.     The Davidson County Board of Commissioners is charged with providing policy

direction for the administration of county government and providing for the efficient operation of

government services. The Board of Commissioners exercises oversight over all county programs

and departments.

386.     Davidson County Department of Social Services (Davidson DSS) is a department

under Davidson County.

387.     The Director of Davidson DSS is the final policymaker for all policies and

procedures established to govern the operations and activities of Davidson DSS.

388.     Patricia Baker is the current Director of Davidson DSS.

389. Davidson County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

390. Davidson County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 38% of children in the custody of Davidson DSS had four or more placements (6% worse than the state average). For children ages 6-12, 49% had four or more placements; and for children ages 13-17, 75% had four or more placements.

391. Davidson County also ranks among the worst jurisdictions for permanency outcomes. The national average for children discharged to permanency within 12 months of entering care is 41%, and the state average is 28%. Between FY2022-2023 2022, Davidson County averaged 29% permanency within 12 months.

392. The vicious cycle of placement instability and delayed permanency compromises the health and safety of children in the custody of Davidson DSS in violation of plaintiffs' federal rights.

393. Davidson County maintains a policy, custom, or pattern of practice of failing to provide necessary services and mental health treatment for children in their custody. Davidson DSS substantially departs from professional judgment from clinicians and other health professionals as to the needs of the children in their care, and does not place children in the least restrictive environment appropriate to their needs.

394.     At the root of these placement and permanency problems are a severe lack of staff and resources. As of August 29, 2024, Davidson DSS only had five caseworkers out of fourteen available positions, a vacancy rate of 64%. Those five caseworkers were responsible for handling over 180 foster children. Licensed foster parents are closing their homes and dropping their foster licenses out of frustration with Davidson DSS.

## Rockingham County and Rockingham County DSS

395.     The Rockingham County Board of Commissioners is charged with providing policy direction for the administration of county government and providing for the efficient operation of government services.

396.     Rockingham County Board of Commissioners created a Consolidated Health and Human Services Agency (Rockingham County DHHS). Rockingham County Department of Social Services (Rockingham County DSS) is a department under Rockingham County DHHS. The Board of Commissioners exercises oversight over all county programs and departments.

397.     The Director of Rockingham County DSS is the final policymaker for all policies and procedures established to govern the operations and activities of Rockingham County DSS.

398.     Carye E. Dickerson is the current Director of Rockingham County DSS.

399.     Rockingham County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

400. Rockingham County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 30% of children in the custody of Rockingham County DSS had four or more placements. For children ages 6-12, 38% had four or more placements; and for children ages 13-17, 31% had four or more placements.

401. The vicious cycle of placement instability compromises the health and safety of children in the custody of Rockingham County DSS in violation of plaintiffs' federal rights.

402. At the root of these placement and permanency problems are a severe lack of staff and resources. For example, media coverage in February 2023 highlighted the shortage of foster parents and foster homes in Rockingham County, which has led to children sleeping in DSS offices.

## Randolph County and Randolph County DSS

403. The Randolph County Board of Commissioners is charged with providing policy direction for the administration of county government and providing for the efficient operation of government services. The Board of Commissioners exercises oversight over all county programs and departments.

404. Randolph County Department of Social Services (Randolph DSS) is a department under Randolph County.

405. The Director of Randolph County DSS is the final policymaker for all policies and procedures established to govern the operations and activities of Randolph County DSS.

406. Tracie Murphy is the current Director of Randolph County DSS.

407. Randolph County's action, inactions, and/or omissions—including, but not limited to, the failure to recruit, retain, and train caseworkers and foster parents—manifest deliberate

indifference to the Plaintiffs' substantive due process rights under the Fourteenth Amendment and substantially increase the serious risk of harm to Plaintiffs—including, but not limited to, the risk of placement disruption and instability, the risk that children will not receive timely or appropriate treatment, and the risk that children will be unnecessarily and unjustly institutionalized.

408. Randolph County maintains a policy, custom, or pattern of practice of shuttling children between placements with dangerous frequency. Between July 2022 and June 2023, 51% of children in the custody of Randolph County DSS had four or more placements. By comparison, 32% of children in DSS custody in North Carolina experienced four or more placements. For children ages 6-12 in Randolph County DSS custody, 58% had four or more placements; and for children ages 13-17, 55% had four or more placements. The median time a child spends in the custody of Randolph County DSS is approximately 549 days.

409. Randolph County also ranks among the worst jurisdictions (nationally and statewide) for permanency outcomes. The national average for children discharged to permanency within 12 months of entering care is 41%, and the state average is 28%. Between FY2023-2024, Randolph County averaged a mere 7% permanency within 12 months.

410. The vicious cycle of placement instability and delayed permanency compromises the health and safety of children in the custody of Randolph County DSS in violation of plaintiffs' federal rights.

411. At the root of these placement and permanency problems are a severe lack of staff and resources. For example, according to the Randolph County DSS Annual Report Fiscal Year 2020-2021, the Child Protective Services In-Home program had "a 50% turnover rate and a lack of qualified applicants applying for vacant positions, resulting in an inability to fill positions in a timely manner." These staffing shortages create "challenges with filing noncompliance petitions

for cases opened for services more than 180 days, with little to no progress toward case closure." The number of foster care children in the custody of DSS rose in the 2020-2021 fiscal year, which resulted in added strain on the Department, including "increased caseloads, increased court time and preparation of court reports, extended work hours for social workers, and increased placements and placement disruptions." A study of Randolph County DSS that was published in November 2022 showed that "foster care has grown by 82 percent in Randolph County since 2016." The number of staff and placement providers has not kept pace with this increase.

### SIXTH CAUSE OF ACTION
**North Carolina Social Services Law**
**(Asserted by County Subclass Against County Defendants)**

412.    Plaintiffs adopt and incorporate by reference all allegations of this Complaint as if fully set out herein.

413.    The foregoing policies and practices of County Defendants, have resulted, and are continuing to result, in deprivations of rights conferred on the Named Plaintiff Children and Plaintiff Children by provisions of the North Carolina Social Services Law and regulations adopted thereto, including:

> a.  The entitlements arising from 10A NCAC 70G.0501, requiring child placement
>     agencies, inter alia, to maintain specified caseload ranges.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court:

1.    Assert jurisdiction over this action;

2.    Order that the Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

3. Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

   a. Defendants' violation of Plaintiff Children's right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

   b. Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 et seq.;

   c. Defendants' violation of Plaintiff Children's rights under Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794.; and,

4. Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights, including:

   a. Require DHHS to establish and enforce mandatory performance metrics for County DSS Child Welfare Services that comport with federal standards.

   b. Require DHHS and the county defendants to enforce the caseload standards set by state law, 10A NCAC 70G.0501, and in accordance with reasonable professional standards for all County DSS Child Welfare Caseworkers.

   c. Require Defendants to recruit and retain enough qualified and appropriately trained workers providing direct supervision and planning for children, in accordance with standards set by the Council on Accreditation and/or Child Welfare League of America;

   d. Require Defendants to place children in placements that are safe, appropriate, and in the least restrictive environment that best suits their individual needs;

e. Enjoin Defendants from placing any child in a congregate care setting based on the unavailability of foster home resources;

f. Require that Defendants ensure that all children who enter foster care placement receive within 30 days of entering care a comprehensive evaluation of the child's needs, performed by a qualified individual, including whether the child has any physical and/or mental disabilities sufficient to be categorized as a child with disabilities under the ADA and that the child be reevaluated as the child's needs and the information available to Defendants change;

g. Require that Defendants ensure that all children who enter foster care placement receive within 60 days of entering care an adequate and individualized written case plan for treatment, services, and supports to address the child's identified needs; describing a plan for reunification with the child's parents, for adoption, or for another permanent, family-like setting; describing any interim placements appropriate for the child while the child moves toward a permanent home-like setting; and describing the steps needed to keep the child safe during the child's time in Defendants' custody;

h. Require that Defendants ensure that all children whose case plan identifies a need for services and/or treatment timely receive those services and/or treatment;

i. Require Defendants to file and proceed with a timely petition to free a child for adoption when the child's permanency plan is adoption, unless the child's case plan documents show that doing so is not in the child's best interest or that the child has a statutory exemption from this requirement;

j.   Require Defendants to take all necessary steps to seek and secure an appropriate adoptive placement for a child when the child's permanency plan goal is adoption;

k.   Require that Defendants, when a child turns 14 years old while in its custody and is unlikely to be reunified with family, adopted, or otherwise placed in a permanent family-like setting, engage in transition planning to meet the healthcare, educational, employment, housing, and other social needs of the child in transitioning to adulthood;

l.   Require Defendants to provide all necessary services to each child who enters foster care, including necessary services to the child's parents to ensure a speedy reunification for as long as the child's permanency plan remains reunification;

m.   Require that Defendants ensure that all children with physical, mental, intellectual, or cognitive disabilities receive foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable professional standards, family foster homes with supportive services;

n.   Require that Defendants ensure that an adequate array of community-based therapeutic services are available to children with disabilities;

o.   Require that Defendants ensure that they develop an adequate array of community-based therapeutic foster homes and therapeutic placements to meet the needs of children with disabilities; and

p.   Require that Defendants conduct annual case record reviews of a statistically significant sample of children in Defendants' custody to measure how likely children in Defendants' custody are to receive timely permanence, as required by

state and federal law, how often they are maltreated in care; and how well placement stability is maintained for these children;

q. Requires that Defendants comply with federal standards regarding timely permanence, maltreatment in care, and placement stability

5. Award Plaintiffs the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, under 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h);

6. Grant such other equitable relief as the Court deems just, necessary and proper to protect Plaintiffs from further harm while in foster care in the care and custody of DHHS and County DSS.

Respectfully submitted, this the 22nd day of November, 2024.

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**

By: /s/ Christopher J. Blake
     Christopher J. Blake
chris.blake@nelsonmullins.com
N.C. State Bar No. 16433
     D. Martin Warf
martin.warf@nelsonmullins.com
N.C. State. Bar No. 32982
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799

**A BETTER CHILDHOOD**

     Marcia Robinson Lowry (*pro hac vice forthcoming*)
mlowry@abetterchildhood.org
     David Baloche (*pro hac vice forthcoming*)
dbaloche@abetterchildhood.org
     Laura Welikson (*pro hac vice forthcoming*)
lwelikson@abetterchildhood.org
     Robyn Goldberg (*pro hac vice forthcoming*)
rgoldberg@abetterchildhood.org
355 Lexington Avenue, Floor 16

96

New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415

*Attorneys for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 22nd day of November 2024, I electronically filed the foregoing

**Amended Complaint** with the Court using the CM/ECF system, which will send notification of

the filing via email to counsel listed below.  Defendants new to the Amended Complaint will be

served consistent with Rule 4 of the Federal Rules of Civil Procedure.

Stephanie Ann Brennan
NC Department of Justice
114 W. Edenton Street
P. O. Box 629
Raleigh, NC 27602-0629
919-716-6920
Fax: 919-716-6764
Email: sbrennan@ncdoj.gov
*Counsel for Roy Cooper*

Katherine Montgomery McCraw
Lisa Bradley
NC Department of Justice
P.O. Box 629
Raleigh, NC 27602
919-716-6577
Email: kmccraw@ncdoj.gov
lbradley@ncdoj.gov
*Counsel for NC DHHS, Kody Kinsley, Susan Osborn, Mark Payne*

Sean F. Perrin
Kimberly Sullivan
Womble Bond Dickinson (US) LLP
301 South College St., Suite 3500
Charlotte, NC 28202
704-331-4992
Fax: 704-338-7814
Email: sean.perrin@wbd-us.com
kimberly.sullivan@wbd-us.com
*Counsel for Mecklenburg County, Mecklenburg County Department
of Social Services-Youth and Family Services*

J. Matthew Little
Jacob H. Wellman
Daniel T. Strong
Teague, Campbell, Dennis & Gorham

4800 Six Forks Road, Suite, 300
Raleigh, NC 27609
919-873-0166
Fax: 919-873-1814
Email: mlittle@teaguecampbell.com
jwellman@tcdg.com
dstrong@teaguecampbell.com
*Counsel for Gaston County, Gaston County Department of Social Services*

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**

By: /s/ Christopher J. Blake
    Christopher J. Blake
    chris.blake@nelsonmullins.com
    N.C. State Bar No. 16433
    D. Martin Warf
    martin.warf@nelsonmullins.com
    N.C. State. Bar No. 32982
    301 Hillsborough Street, Suite 1400
    Raleigh, NC 27603
    Telephone: (919) 329-3800
    Facsimile: (919) 329-3799