IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:24-cv-00783

Jameson C., minor, by next friend
STEVEN BOLCH et al.,

    *Plaintiffs*,

    v.

ROY COOPER, et. al.,

    *Defendants*.

**PLAINTIFFS' OPPOSITION TO
MECKLENBURG COUNTY
AND GASTON COUNTY
DEFENDANTS' MOTIONS TO
DISMISS**

## THE BOTTOM LINE

The disputed issues are (I) whether the Next Friends have standing; (II) whether Plaintiffs state cognizable claims under the U.S. Constitution, (IV) the American with Disabilities Act ("ADA") and Rehabilitation Act, and (V) the Adoption Assistance and Child Welfare Act of 1980 ("AAWCA"); and (III) whether Plaintiffs establish liability under *Monell*. First, the Next Friends satisfy the requirements for standing in the unique context of foster care, and dismissal would be unwarranted even if the Next Friends did not satisfy standing requirements. Second, Plaintiffs sufficiently allege that County Defendants are deliberately indifferent to substantial risks of serious harm in violation of Plaintiffs' substantive due process rights; have impaired meaningful contact with parents and siblings in violation of Plaintiffs' rights of familial association; have violated mandatory, specific, and individually-focused provisions of AAWCA; and have increased Plaintiffs' risk of institutionalization in violation of their rights under the ADA. Finally, Plaintiffs sufficiently state that County Defendants' omission manifests deliberate indifference to Plaintiffs' rights, and that the alleged customs and practices are sufficiently widespread and pervasive as to

attribute them to the County. Plaintiffs ask this court to deny County Defendants' motions to dismiss.

* * *

North Carolina's counties are tired of playing scapegoat for the State's failures. After all, Mecklenburg County argues, "the system is governed by State law and DHHS, not the counties," DHHS is responsible "for administering or supervising the administration of the Child Welfare Services Program in North Carolina" and "is responsible for supervising all 100 county DSS," and "binding regulations promulgated by DHHS define the duties and responsibilities of county DSS." *See* ECF No. 47 at 5 (cleaned up). And why, Mecklenburg County asks, should counties be held liable for violations of AACWA when DHHS is responsible for preparing the state plan? *See id*. at 13.

While Plaintiffs are sympathetic to this frustration with DHHS's lack of leadership and oversight, the Counties also bear responsibility for the risk of harm posed to North Carolina's foster children. Counties must administer the child welfare system and hire enough qualified caseworkers to do so; they must investigate reports of abuse and neglect and take action to protect children from harm; they are responsible for recruiting, training, and supporting foster parents, for completing licensure applications for submission to DHHS, and for supervising foster homes; and they are responsible for case planning and for visiting children in foster homes to ensure their safety. *See* First Amended Complaint ("FAC"), ECF No. 37, ¶ 240-42.

To be sure, lack of assistance from the State makes an already difficult task even more arduous. But this does not immunize Defendants Gaston County, Gaston County Department of Social Services, Mecklenburg County, and Mecklenburg Department of Social Services (collectively, "County Defendants") from liability. County Defendants' policies and practices,

actions and inactions, evince deliberate indifference to the substantial risk of harm they pose to foster children, deprive foster children of meaningful contact with their parents and siblings, increase disabled foster children's risk of institutionalization, and violate foster children's rights under federal and state law. Accordingly, this court should deny County Defendants' motions to dismiss.

## I.    Plaintiffs' Next Friends Have Standing to Bring Claims on Their Behalf

There are two requirements for a Next Friend to have standing: "First, a 'next friend' must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action"; and "[s]econd, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). Given that a minor cannot sue on his or her own behalf, Rule 17(c) of the Federal Rules of Civil Procedure provides that "[a] minor . . . who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem." Fed. R. Civ. P. 17(c)(2).

The County Defendants both rely on *Hamdi v. Rumsfeld*, 294 F.3d. 598 (4th Cir. 2002), which held that, as a general rule, a Next Friend must have some kind of "significant relationship" with the plaintiff. *Id.* at 603-04. *Hamdi*, however, clarified that where an individual "has no significant relationships," a significant relationship might not be required in order to allow the plaintiff to proceed through a next friend. *Id.* at 604 ("We do not have here the situation of someone who has no significant relationships. If we did, this might be a different case."); *see also Coal. of Clergy, Lawyers & Professors v. Bush*, 310 F.3d 1153, 1162 (9th Cir. 2002) ("[T]he contours of the requisite 'significant relationship' do not remain static, but must necessarily adapt to the circumstances.").

Numerous courts have recognized that the peculiar realities of foster care require such a flexible approach to the significant-relationship requirement. The First Circuit aptly explained:

> [D]ue to maltreatment, multiple placements, and social and psychological issues, foster care children are often unable to forge significant relationships with the adults that are entrusted to protect the children's interests. The fact that Plaintiffs filed suit against their legal guardian for alleged violations of the state's obligations as their guardian and custodian further informs our analysis.

*Sam M. v. Carcieri*, 608 F.3d 77, 89 (1st Cir. 2010); *see also Elisa W. v. City of N.Y.*, 2018 U.S. Dist. LEXIS 33857, at *29 (S.D.N.Y. Feb. 28, 2018) ("[C]hildren in foster care . . . are subject to unique circumstances that make it unlikely that someone with a substantial relationship is willing to be their proxy in a federal action."); *Tinsley v. Flanagan*, No. CV-15-00185-PHX-ROS, 2016 U.S. Dist. LEXIS 193289, at *23 (D. Ariz. May 13, 2016) ( "It would be nonsensical to require foster children [to] develop significant relationships before coming to court to ask for help to develop significant relationships").

Often in these cases, there are no other adults "willing or able to represent the Named Plaintiff Children." *E.g. Elisa W.*, 2018 U.S. Dist. LEXIS 33857, at *47; *Tinsley*, 2016 U.S. Dist. LEXIS 193289, at *24. As a result, these courts have permitted Next Friends with "minimal, to non-existent" relationships with the plaintiff children to represent them as long as they demonstrated they were dedicated to their best interests and could adequately prosecute the case on their behalf. *Id.*, at *44-51; *Sam M.*, 608 F.3d at 92-94; *Tinsley*, 2016 U.S. Dist. LEXIS 193289, at *30.

These same circumstances exist here and justify Veronika Monteleone's representation of Annie W., Justin B., and Morgan G. (the "Mecklenburg Plaintiffs"). As the FAC clearly shows, these children, all of whom have a history of trauma from abuse and neglect, which makes forming trusting relationships with adults challenging, and have, subsequent to removal from their homes,

been shuttled from placement to placement by County Defendants, experienced even further abuse and neglect at many of those placements, and were generally deprived of the ability to form stable and secure relationships with the adults in their lives. For example, since DSS took Annie W. into custody, she has been in 22 different placements, including three different Psychiatric Residential Treatment Facilities. FAC ¶ 46. Justin B. has been placed in over 18 placements. *Id.* ¶ 55. The only adult in recent history with whom Justin "had developed a trusting relationship" was his therapist, who specialized in trauma and sexual abuse, and DSS abruptly terminated the relationship after Justin's pre-adoptive placement was disrupted. *Id.* ¶ 61. Morgan G. has been in more than 20 different placements, with many placements lasting no more than a few days. *Id.* ¶¶ 76, 82, 85, 87, 95.

Veronika Monteleone has spent nearly a decade representing children in court, is familiar with North Carolina's foster care system, has acquainted herself with the allegations in the Complaint regarding the Mecklenburg Plaintiffs, and is dedicated to their best interests. FAC ¶¶ 42, 50, 70. Under these circumstances, she is an adequate Next Friend to the Mecklenburg Plaintiffs.

Gaston County's attack of Mr. Bolch's qualifications to represent Jameson C. is even weaker. Mr. Bolch is not a stranger to Jameson; rather, he fostered Jameson for 18 months. *Id.* ¶ 11. *Hamdi* declined to decide "how significant" the relationship had to be to satisfy Next Friend status, 294 F.3d at 604, and Mr. Bolch's relationship with Jameson would certainly satisfy that requirement here. Even after Mr. Bolch ceased fostering Jameson, his new foster parents continued to contact Mr. Bolch to seek advice on Jameson's behavioral issues. FAC ¶ 24. Jameson's caseworker likewise contacted Mr. Bolch for advice on Jameson's medication regimen. *Id.* Mr.

Bolch's continuity of care and interest in Jameson's wellbeing clearly evinces that he has Jameson's best interest at heart and will represent him adequately in this litigation.

Finally, even if either of these Next Friends were deemed inadequate, "Rule 17(c) was not intended to be a vehicle for dismissing claims" as that would be inconsistent with the "purpose of Rule 17(c) . . . to further the child's interest in prosecuting or defending a lawsuit." *Gardner v. Parson*, 874 F.2d 131, 140 (3d Cir. 1989); *see also Davis v. Walker*, 745 F.3d 1303, 1310 (9th Cir. 2014) (same); *Elisa W.*, 2018 U.S. Dist. LEXIS 33857, at *46 ("It is difficult to understand how dismissal on non-merits grounds protects the interests of the Named Plaintiff Children."). Rule 17 requires the court to "appoint a guardian ad litem—or issue another appropriate order—to protect a minor . . . who is unrepresented in an action." Fed. R. Civ. P. 17(c)(2). Thus, the proper relief for a Next Friend lacking standing is to order substitute representation so that Plaintiffs may continue to prosecute their claims.

## II.    Plaintiffs State Cognizable Constitutional Claims

### A.  Substantive Due Process

The Due Process Clause of the Fourteenth Amendment generally acts as a "limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). But "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200.

This "special relationship" exception is well-settled in the foster care context. *See Doe v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 175 (4th Cir. 2010); *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995). Having immediate physical custody of foster children, counties have an

affirmative duty to ensure that foster children are protected against physical and psychological harm.[1] A county violates its constitutional duty when there is a known or obvious risk of harm posed to children in custody, and the county's deliberate action or inaction is objectively unreasonable in light of those known or obvious risks. *See Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).[2]

County Defendants are aware of the risks of harm posed to foster children. *See infra* Sec. III. The only question, then, is whether the asserted rights are cognizable. The County Defendants dispute the cognizability of Plaintiffs' "purported rights." *See* ECF No. 47 at 9; ECF No. 52 at 7. For example, Gaston County asserts that none of the rights Plaintiffs allege fall within the "basic human needs" of foster children that are protected by the Fourteenth Amendment. ECF No. 52 at 7.

Not so. Courts have consistently held that the scope of foster children's substantive due process right is broad and encompasses exactly those rights that Plaintiffs allege. *See, e.g., Jonathan R. v. Justice*, No. 3:19-cv-00710, 2023 U.S. Dist. LEXIS 6658, at *21 (S.D. W. Va. Jan. 13, 2023) (foster children's right to protection of their well-being extends to *emotional* as well as

---

[1] *Accord* ECF No. 47 at 8 (Mecklenburg Motion) ("[T]he State must provide children in its custody personal security and reasonably safe living conditions free from an unreasonable risk of both physical and psychological harm." (citing *Youngberg v. Romeo*, 457 U.S. 307, 315, 321 (1982))).

[2] County Defendants also allege that a defendants' behavior must be "conscious-shocking" to violate due process. *See* ECF No. 47 at 8; ECF No. 52 at 6 (Gaston Motion). This is mere rhetoric. And Plaintiffs' allegations satisfy this standard as "[r]eckless indifference to a child's safety would doubtless shock the conscience." *See Slade v. Bd. of Sch. Dirs. of Milwaukee*, 702 F.3d 1027, 1033 (7th Cir. 2012). Notably, however, this kind of rhetoric has been modified in more recent recitations of the deliberate indifference standard. *See Short*, 87 F.4th at 611 (adopting objective deliberate indifference standard which requires plaintiff to show that the defendant knew or should have known of the risk of harm to the plaintiff and "the defendant's action or inaction was . . . 'objectively unreasonable'"); *see also Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 342 (4th Cir. 2021) (defendant with custody over minor plaintiff "fails to provide a constitutionally adequate level of . . . care if it substantially departs from accepted professional standards") (citing *Youngberg*, 457 U.S. at 323)).

physical well-being) (citing cases); *id.* at *23 (recognizing "the right to conditions and duration of foster care reasonably related to the purpose of government custody, and the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody"); *M.D. v. Abbott*, 152 F. Supp. 3d 684, 696 (S.D. Tex. 2015) (right to "protection from psychological as well as physical abuse"); *Marisol A. v. Giuliani*, 929 F. Supp. 662, 675 (S.D.N.Y. 1996) ("right to be free from unreasonable and unnecessary intrusions into their emotional well-being"); *Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 880 (5th Cir. 2004) ("personal security and reasonably safe living conditions"); *Olivia Y. ex rel. Johnson v. Barbour*, 351 F. Supp. 2d 543, 556 (S.D. Miss. 2004); *Connor B. v. Patrick*, 771 F. Supp. 2d 142, 161 (D. Mass. 2011) ("the right to remain in custody no longer than necessary under the circumstances, the right to receive care and treatment in accordance with accepted standards of professional judgment, and the right to be placed in the least restrictive environment"); *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) (right to be free from unreasonable risk of harm encompasses the right to "social worker supervision and protection from harm inflicted by a foster parent"); *Brian A. by Brooks v. Sundquist*, 149 F. Supp. 2d 941, 953-54 (M.D. Tenn. 2000) ("the right not to be deprived of [] liberty unnecessarily by retention in state custody" and the "right to be placed in the least restrictive, most appropriate, family-like setting while in state custody").

Mecklenburg County attempts to overcome this substantial weight of authority by citing a few stray cases that are either against the weight of authority or otherwise distinguishable.

First, citing *Charlie H. v. Whitman*, 83 F. Supp. 476, 507 (D.N.J. 2000), Mecklenburg County argues that there is "no due process right to not remain in state custody unnecessarily or be housed in the least restrictive, most appropriate family-like placement." ECF No. 47 at 9. But,

as discussed above, the majority of courts addressing such claims hold these rights fall squarely within the Fourteenth Amendment's protection. *E.g. Jonathan R.*, 2023 U.S. Dist. LEXIS 6658, at *23; *Connor B.,* 771 F. Supp. 2d at 161; *Brian A.*, 149 F. Supp. 2d at 953-54. Understandably so. The legal basis for taking a child into custody is to protect the child from imminent safety risks. Once those risks have been eliminated—either because the parents resolved the issues that led to the child's removal, or because the parents' rights were terminated to free the child for adoption— the legal basis for custody expires. Custody that continues unnecessarily and indefinitely causes children's mental health and wellbeing to deteriorate significantly, which decreases the likelihood of permanency. *See* FAC ¶¶ 60, 244. Plaintiffs allege facts showing that both County Defendants are deliberately indifferent to the risks associated with prolonged and unnecessary custody.[3]

Second, citing *Reno v. Flores*, 507 U.S. 292, 302-03 (1993), Mecklenburg County argues that there is "no due process protection for placement decisions." In fact, the right asserted in *Reno* was a right "to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id* at 302. Plaintiffs do not assert such a right here. Plaintiffs do, however, assert a right to protection against unsafe placements. And the Fourth Circuit has held that the constitutional duty owed to foster children "includes a duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security." *Doe*, 597 F.3d at 175. Moreover, Plaintiffs allege facts

---

[3] For example, Annie W. has been in the custody of Mecklenburg County for nearly 10 years, 6 of which she has been a legal orphan. *See* FAC ¶¶ 42-43. Mecklenburg County has failed to find a permanent home for Justin B after nearly a decade in custody. *Id*. ¶ 68. DSS has no made plans for Morgan G. to obtain permanency after a decade of custody and now he is only a few years away of aging out of the foster care system. *Id*. ¶¶ 71, 95. Jameson C. has been in foster care for half his life, and Gaston DSS has refused to file a petition to terminate parental rights. *Id*. ¶¶ 19, 26.

showing that County Defendants made placements that were deliberately indifferent to Plaintiffs' right to personal safety and security.[4]

Third, citing *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990), Mecklenburg County argues that there is no due process right to a "stable foster-home environment." ECF No. 47 at 9. The question in *K.H.*, however, was whether the right was clearly established for purposes of qualified immunity from damages, not whether the right was cognizable. *K.H*, 914 F.2d at 853. Indeed, the court explicitly set aside the question of cognizeability "to be explored not in damages suits but in equity actions" *Id*. And the *K.H.* court suggested that precisely what Plaintiffs allege here is a cognizable right: "The wrong lies not in the shuttle itself . . . but in a system of foster care that is unable to achieve a reasonable balance among safety, competence, and stability." *Id*. Plaintiffs allege facts showing that the County Defendants have failed abjectly to achieve a reasonable balance between safety, competence, and stability; and that as a consequence of this imbalance and instability, Plaintiffs have suffered and are at risk of suffering serious risk of harm.[5]

Finally, citing *Youngberg*, Mecklenburg County argues that due process only requires the county to provide "minimally adequate care and treatment." ECF No. 47 at 9. Plaintiffs, however, are not asking for optimal treatment; they are asking for the constitutional minimum. And the allegations contained in the Amended Complaint show that the County Defendants fail to provide

---

[4] *See, e.g.*, FAC ¶ 14 (Jameson C. in various placements where he never received necessary mental health treatment and was overprescribed psychotropic medications); ¶¶ 46-47 (Annie W. placed in unsafe placements, including hospital emergency departments, that could not support her mental health or educational needs); ¶¶ 52, 55-56, 59-60, 63-66 (Justin B. in placements with known safety risks, where his individualized need could not be met); ¶¶ 79, 82-84, 87-88, 90-94 (Morgan G. in out-of-state facility despite not meeting medical criteria and without information or records necessary to adequately care for his needs).

[5] *See, e.g.,* FAC ¶¶ 13-14, 46-47, 55-57, 63, 66, 73-74, 76, 82-85, 94-95.

the most basic treatment to the Plaintiffs.[6] Courts routinely deny motions to dismiss where the agency failed to provide medical or mental health treatment that it knew or should have known was necessary. *See, e.g., Jeremiah M. v. Crum*, 695 F. Supp. 3d 1060, 1093 (D. Alaska 2023) (denying motion to dismiss in response to allegations that "Plaintiffs are not receiving medical or behavioral services, despite [the agency's] knowledge of their need for those services, and that [the agency] fails to notify foster parents of children's medical and behavioral needs.").

Plaintiffs sufficiently state cognizable substantive due process rights and violations thereof.

## B. Familial Association

The right to familial association is deeply rooted in the First, Ninth, and Fourteenth Amendments, and the denial of meaningful contact with parents and siblings constitutes an intrusion into this right.[7]

Mecklenburg County's motion does little more than state that the right to familial association is a negative right against unjustified intrusion and does not impose any affirmative obligations. *See* ECF No. 47 at 10-11. This restatement of law is accurate but nonresponsive. Plaintiffs' theory is that Defendants' policies and practices—including the failure to engage in meaningful permanency planning, failure to provide reunification services, and placement in

---

[6] *See, e.g.,* FAC ¶ 14 (Jameson C. in various placements where he never received necessary mental health treatment or specialized therapy); ¶¶ 45-47 (Annie W. did not receive adequate care or treatment in extended hospital stays, causing her health and wellbeing to deteriorate and placing her at increased risk of institutionalization); ¶¶ 54, 56, 63, 65 (Justin B. did not receive timely care and mental health treatment in rapid response home, hospital emergency room, or residential treatment program); ¶¶ 59-60 (DSS failed to notify placement of Justin B.'s medical and behavioral needs, resulting in placement disruption); ¶ 61 (DSS disrupted Justin B.'s mental health treatment); ¶ 83 (DSS failed to provide information to placement about Morgan G.'s medical and behavioral needs); ¶¶ 87-95 (Morgan G. did not received adequate care and mental health treatment in hospital, placing him at serious risk of life-threatening situations and incarceration).

[7] Plaintiffs incorporate by reference their discussion from their Opposition to DHHS Defendants' Motion to Dismiss ("DHHS Opposition"). *See* ECF No. 92 at 14-15.

distant and out-of-state locations—result in the systematic and unjustifiable intrusion upon the parent-child and sibling relationships of foster children while in custody, and Plaintiffs allege facts showing that County Defendants have intruded on this right.[8]

Gaston County argues separately that there can be no plausible violation as to Jameson C. because Plaintiffs' allege familial association was improper in his case. *See* ECF No. 52 at 8. But allegations that the county improperly facilitated visits between parents and children does not militate against Plaintiffs. It simply reinforces that the right is protected against *unjustified* state interference. The county justifiably interferes with the right to familial association when it removes a child from their parents due to imminent safety risks. And it justifiably interferes with the right to familial association when it ceases visitations that threaten the child's safety and wellbeing. For example, the county should have justifiably ceased visitation in the case of Jameson C. when it became apparent that such associations were threatening their safety and wellbeing. These countervailing interests justify intrusion into the parent-child relationship. But a lack of adequate placements that results in out-of-state or distant placements is not a countervailing interest that justifies intrusion into parent-child relationships. Nor is it a lack of qualified caseworkers that results in delayed and denied family reunification services.

### III. Plaintiffs Sufficiently Allege the Remaining Elements of *Monell* Liability.

The County Defendants argue that even if there were underlying constitutional violations, Plaintiffs have not sufficiently alleged that they were caused by an official policy or custom of Defendants. *See* ECF No. 47 at 16-17; ECF No. 52 at 9-10. These arguments both ignore the various ways in which a *Monell* claim can be proven and the numerous allegations in the Amended Complaint that support Plaintiffs' *Monell* claims.

---

[8] *See, e.g.*, FAC ¶¶ 13, 26, 55, 67, 73-74, 82-84.

Although the County Defendants correctly articulate the four-pronged test for proving *Monell* liability in *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003), their discussion completely overlooks the third prong: namely, "an omission, such as a failure to properly train . . . that manifests deliberate indifference to the rights of citizens." *Id.* (cleaned up). Moreover, as to deficiencies in formal programs, "the design and implementation of training programs and the follow-up supervision of trainees, is necessarily a matter of 'policy' within the meaning of *Monell*." *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987). "To the extent such an official municipal policy has deficiencies resulting from municipal fault that then cause specific constitutional violations by deficiently trained [workers], the municipality is liable under 42 U.S.C. § 1983." *Id.* Municipal policy makers need not expressly, or even tacitly, authorize these deficiencies to incur *Monell* liability. *Id.* at 1390. Liability can accrue based on "failures adequately to prohibit or discourage readily foreseeable conduct in light of known exigencies of . . . duty." *Id.*

Plaintiffs specifically allege a failure to train, as well as a host of other omissions and inactions, that are the moving force behind their constitutional deprivations. *See, e.g.*, FAC ¶¶ 273-75 (failure to train); ¶¶ 263-68, 271 (failure to maintain manageable caseload standards); ¶¶ 264-68, 275 (failure to recruit and retain a sufficient number of qualified caseworkers); ¶¶ 245-46, 251 (failure to license, recruit, and retain a sufficient number of appropriate and safe foster homes); ¶¶ 245, 254, 256, 258, 283, 285, 287 (failure to provide necessary services), ¶¶ 258, 265 280-81, 285, 287-88, (failure to achieve permanency); ¶¶ 282-88 (failure to perform adequate case planning).

Mecklenburg County contends that "a severe lack of staff and resources" does not constitute a "custom or usage with the force of law." ECF No. 47 at 17. Again, this misconstrues Plaintiffs' theory of liability—here premised on omission evincing deliberate indifference. *Lytle*, 326 F.3d at 471. Furthermore, severe staffing shortages that result in a substantial risk of harm to

the plaintiff can sufficiently establish a *Monell* claim. *See Murray v. S.C. Dep't of Corr.*, Civil Action No. 6:19-00100-RMG-MGB, 2020 U.S. Dist. LEXIS 188336, at *53-54 (D.S.C. May 5, 2020) (denying summary judgment on *Monell* claim where there was "a question of fact as to whether the severe staff shortage at [the prison] and the resulting security issues created a substantial risk of harm to Plaintiff").

Plaintiffs also adequately allege how these omissions or inactions expose them to a substantial risk of serious harm to their physical and emotional well-being, thus causing their constitutional deprivations. *E.g., id.* ¶ 245 (County DSS's failure to license, recruit, and retain a sufficient number of appropriate foster homes, and to provide necessary supports to those homes causes children to be housed in unsafe and inappropriate settings); *id.* ("'Living' in these inappropriate settings compounds the trauma that children experience during separation from their families and natural support systems."); ¶ 253 ("The lack of appropriate foster homes in North Carolina has led to a dramatic increase in placement instability."); ¶ 244 ("Placement instability produces a cascade of intersecting and compounding harms . . ."); ¶ 258 (reliance upon group homes for placement "places children at serious risk of harm"); ¶ 279 ("States must act swiftly to secure permanency for children because extended stays in foster care can disrupt a child's sense of belonging and hinder their emotional, educational, and social development."); ¶ 288 ("Case planning issues lead to longer times to permanency, to failures in reunification where reunification is possible, and to further emotional and physical harm to foster children."); ¶ 260 (failure to recruit and retain qualified caseworkers endangers the vital role they play in "ensuring the safety, permanency, and well-being of children who are at risk of abuse, neglect, or exploitation").

Plaintiffs also allege a theory of *Monell* liability under the fourth prong of *Lytle*: through "practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force

of law.'" 326 F.3d at 471. For example, Plaintiffs allege that the County Defendants routinely house foster children in inappropriate and unsafe settings, such as DSS offices, jails, hotel rooms, homeless shelters, and hospital emergency rooms. *E.g.,* FAC ¶¶ 245-46, 250-52. With respect to the latter, Plaintiffs specifically allege that County DSS has developed "a disturbing practice . . . of abandoning foster children in hospital emergency rooms with little agency contact and no educational or mental health services." *Id.* ¶ 254. Plaintiffs also allege that County Defendants have fostered a "culture of fear and retribution" against foster parents for requesting services for the children they foster, or "for voicing opinions or opposing DSS recommendations." *Id.* ¶ 256. These retaliatory practices exacerbate County Defendants' foster home recruitment and retention problems. *Id.* ¶ 257.

The County Defendants ignore all these factual allegations and focus myopically on the handful of allegations that fall under the Fifth Cause of Action in the Amended Complaint. *See id.* ¶¶ 346-366. But this narrow lens misses the point. The official federal and state audits, numerous press articles, and statements of high-ranking officials, such as DHHS's Susan Osborne speaking to Directors of County DSS across the State, *id.* ¶ 246, only further underscore that these problems are <u>widespread</u> throughout the State. They are not isolated incidents concentrated in one particular County. To the contrary, this continuous coverage of an entire system "in 'crisis,'" *id.*, supports the inference that this "pattern of comparable practices has become actually or constructively known to responsible policymakers," as is required to prove a *Monell* pattern or practice claim. *See Howard v. City of Durham*, 68 F.4th 934, 952 (4th Cir. 2023) (quoting *Spell*, 824 F.2d at 1391).

Moreover, the statistics Plaintiffs cite regarding County Defendants' placement instability (FAC ¶¶ 354, 364), delayed permanency outcomes (*id.* ¶¶ 355, 365), and severe staffing (*id.* ¶ 357) and foster home shortages (*id.* ¶ 363)—none of which Defendants refute—create the reasonable

inference that these factual allegations of persistent problems throughout the State also exist in Mecklenburg and Gaston. *See Murray*, 2020 U.S. Dist. LEXIS 188336, at *53-54 (unrefuted statistics of widespread staffing shortages in prison supported claim that plaintiff's individual housing area was understaffed during alleged unconstitutional violation); *Doe v. Citadel*, No. 2:21-cv-04198-DCN, 2022 U.S. Dist. LEXIS 127707, at *38 (D.S.C. July 18, 2022) ("statistics 'may provide context' when combined with other circumstantial evidence" of unconstitutional conduct).[9]

What is more, Mecklenburg fails to even address Plaintiffs' allegations regarding its custom or pattern of practice of abandoning foster children in hospital emergency departments without adequate services or safety. FAC ¶¶ 350-53. Indeed, the Mecklenburg Plaintiffs' stories are all illustrative of this practice. *See id.* ¶¶ 47 (Annie W.); 63-65 (Justin B.); 87-94 (Morgan G.).

In sum, Plaintiffs' allegations sufficiently state a claim for *Monell* liability against the County Defendants. Given the amount of already publicly available information supporting their claims, Plaintiffs are confident that further discovery will only yield additional evidence of official policies, practices, and/or omissions by County Defendants that are the moving force behind Plaintiffs' injuries.

## IV.    Plaintiffs Sufficiently State Claims Under the ADA and Rehabilitation Act

Plaintiffs incorporate by reference their discussion of Title II of the ADA, its corresponding regulations, and the binding precedents interpreting them from their DHHS Opposition. *See* ECF

---

[9] Gaston County also argues that Plaintiffs' statistics regarding permanency delays and placement instability lack context because they do not consider "the frequency of, or justification for, the changes in placements." ECF 52 at 10. This argument misses the point. "Plaintiffs' claims turn not on the cause of permanency delays [or placement changes] for any particular child, but on whether [Defendants'] practices lead to permanency delays [and placement instability] thereby placing all foster children at an unreasonable risk of harm." *Elisa W. v. City of N.Y.*, 82 F.4th 115, 126 (2d Cir. 2023).

No. 92 at 18-20. County Defendants' attack on the sufficiency of Plaintiffs' allegations respecting these claims ring hollow. First, they contend that Plaintiffs do not allege what specific disabilities they have. *See* ECF No. 47 at 13; ECF No. 52 at 12. But the Amended Complaint does exactly that. Plaintiffs allege that the ADA Subclass "have behavioral, developmental and psychiatric disabilities, which qualify them as individuals within the meaning of the ADA . . . [and] Rehabilitation Act." FAC ¶ 336.

Second, County Defendants assert that Plaintiffs do not allege what actions or inactions of theirs constitute actionable discrimination or otherwise violate the ADA or Rehabilitation Act. ECF No. 47 at 13-14; ECF No. 52 at 12. Defendants appear to be arguing that the FAC fails to give them adequate notice of the substance of the claim; however, this argument belies reality and ignores the abundant allegations in the FAC that portray Defendants' violations of the ADA's and Rehabilitation Act's integration mandate. Indeed, Mecklenburg County demonstrates that it knows full well the nature of the claim when it asserts that "[t]o the extent the allegations state that Plaintiffs seek placement in the most integrated environment appropriate to children's needs and not placed in overly restricted settings, the claim still fails as a matter of law." ECF No. 47 at 13.

The FAC provides adequate notice of this claim. The ADA Subclass alleges that they "have been or are at risk of being placed in overly restrictive settings and subjected to unnecessary trauma because of their disabilities." FAC ¶ 344. And several allegations in the FAC explain exactly how County Defendants create this risk. Specifically, County Defendants' frequently place children in overly restrictive settings, including congregate care facilities, psychiatric residential treatment facilities, and, all too often, hospital emergency departments, when they are not medically necessary, nor even responsive to their psychiatric needs. *Id.* ¶¶ 47, 63-65, 87-94, 245-46, 250-52, 350-53.

County Defendants next argue that the statutes do not require States to "provide a certain level of benefits to individuals with disabilities." ECF No. 47 at 14 (quoting *Olmstead*, 527 U.S. at 603 n.14); ECF No. 52 at 12 (same). But this argument rests on a faulty reading of *Olmstead*. The very next sentence in the quoted footnote says that "States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *Olmstead*, 527 U.S. at 603 n.14. As one court aptly explained when rejecting this identical argument:

> Defendants here offer a service—the foster care system—to Plaintiffs. And when offering this service, Defendants must make reasonable modifications so that Plaintiffs can fully participate in it. Requiring Defendants to provide Plaintiffs with mental health services and disability supports is entirely consistent with this mandate—these services are necessary for Plaintiffs to participate in the foster care system, and they are not entirely new, stand-alone programs.

*Jonathan R.*, 2023 U.S. Dist. LEXIS 6658, at *58. For the same reasons, *Alexander v. Choate*, 469 U.S. 287, 303 (1985), and *Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999), are distinguishable.

Lastly, County Defendants vaguely assert that Plaintiffs have no support for their position that disabled children must be "placed in the 'most integrated environment' regardless of circumstances or resources." ECF No. 47 at 14; ECF No. 52 at 13. To the extent Defendants are asserting a fundamental alteration defense, that is "a fact-specific inquiry not appropriate for determination at the motion to dismiss stage." *Timothy B. v. Kinsley*, No. 1:22-cv-1046, 2024 U.S. Dist. LEXIS 57276, at *47 (M.D.N.C. Mar. 29, 2024).

## V. Plaintiffs Sufficiently Plead Claims Under AACWA and North Carolina Social Services Law

County Defendants' arguments for dismissing Plaintiffs' claims under the Adoption Assistance and Child Welfare Act ("AACWA") (ECF No. 47 at 11-13, ECF No. 52 at 10-12) largely mirror those made by DHHS Defendants (ECF No. 57 at 20-23), and they are wrong for

the same reasons.[10] There are, however, a few additional arguments raised by County Defendants that warrant a response.

First, Gaston County argues that §§ 675(1) and 675(5) cannot create private rights because they are located in the statute's definitions section. This acontextual reading is wrong. § 671(a)(16) sets out the case plan requirement, § 675 defines a case plan. Reading one provision in isolation, as Defendants do, renders the other provision meaningless. Defendants' interpretation violates basic principles of statutory interpretation and should be rejected. *See Cruz v. Garland*, 101 F.4th 361, 367 (4th Cir. 2024) ("Analyzing a statute requires more than reading the words of a provision in a vacuum, it requires reading the words in the context of the statute as a whole.").

Second, County Defendants list several factors that purportedly weigh against private enforceability: the language of § 671(a) requires States to develop a plan in order to receive federal funding, states must "substantially comply" to receive funding, and the Secretary can withhold funding to enforce compliance with the statute. *See* ECF No. 47 at 11-13; ECF No. 52 at 10-12. According to County Defendants, these aspects of the statute indicate that it is focused on the regulated entity, not the beneficiaries of the regulation, that the statute is not focused on individual rights, and that there is an internal enforcement mechanism—evincing Congress' intent to preclude private enforcement. *Id*.

Under County Defendants' interpretation, no Spending Clause legislation could ever create private rights. This is precisely the logic that the Supreme Court rejected in *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 177, 187-90 (2023) (emphasizing that requiring substantial compliance in exchange for federal funds does not evince Congress' intent to preclude

---

[10] Plaintiffs incorporate by reference their discussion from their DHHS Opposition. *See* ECF No. 92 at 15-18.

private enforcement, and that the mere existence of an explicit enforcement mechanism with respect to one statutory provision does not imply that Congress precluded §1983-enforcement of other statutory provisions).

Finally, County Defendants' argument does not contend with the individually-focused, mandatory, and specific language of the asserted provisions, choosing instead to analyze language contained elsewhere in the statute.

County Defendants likewise mount a superficial attack on Plaintiffs' claim under Chapter 7B of the North Carolina Social Services Law, N.C. G.S. § 7B-100 *et seq.*, and corresponding regulations, 10A N.C.A.C. 70G.0501. Namely, they fail to address the implicit private right of action they create. *See Sykes v. Health Network Sols.*, 372 N.C. 326, 338, 828 S.E.2d 467, 474 (2019) ( "[A] statute may authorize a private right of action either explicitly or implicitly[.]").

Although the North Carolina Supreme Court "has not addressed the circumstances in which a statute *implicitly* authorizes a private cause of action, the Court of Appeals has concluded that "an **implicit** right of a cause of action exists when a statute requires action from a party, and that party has failed to comply with the statutory mandate." *United Daughters of the Confederacy v. City of Winston-Salem*, 383 N.C. 612, 637-38, 881 S.E.2d 32, 52 (2022) (quoting *Sugar Creek Charter Sch., Inc. v. Charlotte-Mecklenburg Bd. of Educ.*, 195 N.C. App. 348, 355, 673 S.E.2d 667 (2009)); *see also Williams v. Alexander Cnty. Bd. of Educ.*, 128 N.C. App. 599, 604, 495 S.E.2d 406, 409 (1998) (implicit private right of action can be construed when "the statutory language is 'unambiguous, direct, imperative and mandatory.'"). When such implicit right of action exists, "the plaintiff has standing to vindicate the legal right so long as he is in the class of persons on whom the statute confers a cause of action." *United Daughters of the Confederacy*, 383 N.C. at 637 (citation and alterations omitted).

Applying these principles, N.C. G.S. § 7B and 10A N.C.A.C. 70G.0501 create an implicit private right of action that confers standing on Plaintiffs, the foster children whose rights § 7B is designed to protect and vindicate. 10A N.C.A.C. 70G.0501 contains language that is "unambiguous, direct, imperative and mandatory." *Williams*, 128 N.C. App. At 604. For example, the regulation provides that "Social Workers or Case Managers serving children in family foster homes shall serve no more than 15 children." 10A N.C.A.C. 70G.0501(d). It outlines a strict supervisor to social worker / case manager ratio and mandates that "[t]here shall be one additional supervisor for every one to five additional social workers or case managers." *Id.* § 70G.0501(e). And it mandates that supervisors, social workers, and case managers "receive training in the areas of child development, permanency planning methodology, family systems and relationships, child sexual abuse, trauma-informed care, and the reasonable and prudent parent standard." *Id.* § 70G.0501(f). Plaintiffs adequately allege that County Defendants violate these unambiguous, direct, and imperative statutory mandates.

Furthermore, the purpose of N.C. G.S. § 7B is to protect and defend the rights of foster children. For example, § 7B-100 states that the statute's purpose is "To provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents," § 7B-100(1); "To provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence," § 7B-100(3); "To provide standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents," § 7B-100(4); and "To provide standards…for ensuring that the best interests of the juvenile are of paramount consideration…," § 7B-100(5).

## VI. County DSS Are Not Suable Entities

Having reviewed County Defendants' authorities regarding whether county DSS are suable entities, Plaintiffs concede that Mecklenburg County Department of Social Services-Youth and Family Services and Gaston County Department of Social Services can be dismissed. The illegal actions of those County agencies are attributable to, and not separate and apart from, the Counties themselves and County Defendants may answer for them. *See, e.g.*, *Montgomery v. Johnston Cnty. Dep't of Soc. Servs.*, No. 5:23-CV-00041-FL, 2023 U.S. Dist. LEXIS 131021, at *18 (E.D.N.C. June 2, 2023) ("an action against a county agency which directly affects the rights of the county is in fact an action against the county." (citation omitted)).

## CONCLUSION

This court should dismiss County Defendants' motions to dismiss.

Respectfully submitted, this the 8th day of January, 2025.

/s/ Christopher J. Blake
Christopher J. Blake
chris.blake@nelsonmullins.com
N.C. State Bar No. 16433
D. Martin Warf
martin.warf@nelsonmullins.com
N.C. State. Bar No. 32982
**NELSON MULLINS RILEY &**
**SCARBOROUGH, LLP**
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799

Marcia Robinson Lowry (*admitted pro hac vice*)
mlowry@abetterchildhood.org
David Baloche (*pro hac vice forthcoming*)
dbaloche@abetterchildhood.org
Laura Welikson (*admitted pro hac vice*)
lwelikson@abetterchildhood.org
Robyn Goldberg (*pro hac vice forthcoming*)
rgoldberg@abetterchildhood.org

**A BETTER CHILDHOOD**
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415

*Attorneys for Plaintiffs*

## WORD COUNT CERTIFICATION

The undersigned certifies that the foregoing Memorandum of Law, excluding the case caption and certificates of counsel, does not exceed the 7,000-word limit allowed by order of this Court dated January 6, 2025, ECF No. 88.

Respectfully submitted, this the 8th day of January, 2025.

/s/ *Christopher J. Blake*
Christopher J. Blake

## AI CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. Every Statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted, this the 8th day of January, 2025.

/s/ *Christopher J. Blake*
Christopher J. Blake

**CERTIFICATE OF SERVICE**

I, Christopher J. Blake, hereby certify that on this day I caused a true and correct copy of the foregoing to be filed through the CM/ECF system which will send e-mail notification of the filing to the registered participants as identified on the Notice of Electronic Filing.

Respectfully submitted, this the 8th day of January, 2025.

/s/ Christopher J. Blake
Christopher J. Blake
chris.blake@nelsonmullins.com
N.C. State Bar No. 16433
D. Martin Warf
martin.warf@nelsonmullins.com
N.C. State. Bar No. 32982
**NELSON MULLINS RILEY &
SCARBOROUGH, LLP**
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799